S. A. EMPRESA DE VIACAO AEREA RIO GRANDENSE (VARIG AIRLINES), Plaintiff-Appellant,

v.

WALTER KIDDE & COMPANY, INC., Defendant-Appellee.

No. 79–3720.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 5, 1980.

Decided Feb. 26, 1982.

As Amended June 3, 1982.

Phillip D. Bostwick, Washington, D. C., argued, for plaintiff-appellant; James B. Hamilin, Shaw, Pittman, Potts & Trowbridge, Washington, D. C., on brief.

H. G. Robert Fong, Los Angeles, Cal., argued, for defendant-appellee; Joseph E. Gregorich, Robert C. Packard, Kirtland & Packard, Los Angeles, Cal., on brief.

Before FERGUSON and NORRIS, Circuit Judges, and PANNER,* District Judge.

PANNER, District Judge:

Varig Airlines sued the Boeing Company and a component manufacturer, Weber Aircraft, a division of Walter Kidde & Co., for loss of the Boeing 707 that crashed outside Paris, France, on July 11, 1973, en route from Brazil. Varig appeals from the summary judgment granted by the district court in favor of Weber.[1]

The crash occurred after dense smoke completely filled the aircraft, suffocated many passengers, and obscured the pilot's vision. One hundred twenty-four persons died and the aircraft was destroyed. The French Commission of Inquiry concluded that the probable cause of the crash was a fire that apparently broke out in the used towel receptacle in an aft lavatory. Weber

---

* The Honorable Owen M. Panner, United States District Judge for the District of Oregon, sitting by designation.

1. Boeing was granted summary judgment earlier in the litigation on the ground that an exculpatory clause in Boeing's original sales contract exempted Boeing from liability. The summary judgment was upheld by this court on appeal. *Varig Airlines v. Boeing Co.*, 641 F.2d 746 (9th Cir. 1981).

manufactured the aft lavatory sink and cabinet unit which included the receptacle for used towels. Varig sought recovery from Weber on theories of (1) negligent design and manufacture of the sink and dispenser unit, (2) post-delivery negligence, and (3) strict liability in tort.

## I. NEGLIGENT DESIGN AND MANUFACTURE THEORY

The district court granted summary judgment on the ground that Boeing, not Weber, was responsible for the design of the unit, and that the unit was manufactured by Weber to Boeing's design specifications.[2]

Weber argued that it had no responsibility for the design of the unit. This "carpenter-architect" defense is based upon a line of California cases involving the construction industry.[3] *Massei v. Lettunich*, 248 Cal.App.2d 68, 56 Cal.Rptr. 232 (1967);

*Barnthouse v. California Steel Buildings Co.*, 215 Cal.App.2d 72, 29 Cal.Rptr. 835 (1963); *Johnson v. City of San Leandro*, 179 Cal.App.2d 794, 801, 4 Cal.Rptr. 404 (1960). The district court found, as a matter of undisputed fact, that the design of the Weber-built unit was dictated by Boeing with no real opportunity for participation by Weber.[4]

Varig contends that a genuine issue of material fact exists as to Weber's participation in the design of the used towel component of the unit. Performance requirements for the sink and dispenser unit are set forth in a "specification control document" which Weber received from Boeing. Varig contends this document supports an inference that Weber had considerable responsibility for the design of the used towel receptacle subject to Boeing's final approval. Varig also cites the deposition testimony of Don Swett, sales manager for Weber,

**2.** Weber also initially argued that the cause of action for negligent design and manufacture should be dismissed because of the dismissal of Boeing. The district court recognized this as a very strong argument in Weber's favor. For some reason Weber waived this argument by stipulation. In view of this waiver, it is unnecessary to discuss the court's conclusions relating to the dismissal of Boeing, including the conclusion that Boeing's dismissal makes it inequitable to permit Varig to proceed against Weber.

**3.** Both parties agree that California law applies.

**4.** The district court made the following findings of fact concerning the degree of Weber's participation in the design of the unit:

12. The sink and dispenser units supplied by WEBER for incorporation into 707 aft lavatories were manufactured to a Boeing specification.

13. The lavatory components supplied by WEBER for incorporation into 707 aft lavatories were not separate, entire lavatory units.

14. The approximate cost to Boeing for the WEBER components installed in each aft lavatory for the subject aircraft was approximately $3,400.

15. The design, construction, manufacture, testing, and performance requirements of the WEBER components installed on the subject aircraft were dictated by Boeing.

16. Boeing dictated the design trade-offs for the subject aircraft, including those trade-offs relating to safety, fire prevention, fire detection, fire containment, and fire extinguishment. WEBER had neither the occasion nor the opportunity to participate in these matters.

17. Any design changes recommended by WEBER AIRCRAFT for the sink and dispenser units of 707 aircraft had to be approved by Boeing.

18. Any detailed design provided by WEBER for the sink and dispenser units of 707 aircraft must have been approved by Boeing.

19. All work performed by WEBER resulting in delivery of sink and dispenser units to Boeing for incorporation in 707 aircraft was done pursuant to Boeing contracts and specifications.

20. WEBER's rights and duties with respect to sink and dispenser units delivered to Boeing for use in 707 aircraft were governed by specifications provided by Boeing.

21. WEBER is not in a position to defend the design, certification, testing, or manufacture of Boeing 707, or of the aft lavatories of 707 aircraft.

For a helpful discussion of the purpose and effect of "findings of fact" in a summary judgment proceeding, *see Garter-Bare Co. v. Munsingwear, Inc.*, 650 F.2d 975, 982–83 (9th Cir. 1980) (Wallace, J., concurring).

and argues that Weber had detailed design responsibility for the unit within the general design parameters dictated by Boeing.

Summary judgment is proper only when there is no genuine issue as to any material fact. *E.g., Spectrum Financial Companies v. Marconsult, Inc.*, 608 F.2d 377, 380 (9th Cir. 1979). In reviewing a summary judgment, we view the evidence in the light most favorable to the party opposing the summary judgment. *E.g., Bratton v. Bethlehem Steel Corp.*, 649 F.2d 658, 664 (9th Cir. 1980).

■ Here, however, appellant has not cited any portion of the record that demonstrates or even implies the validity of its propositions. Reversal should not occur because of confusion in the record.[5] The deficient appellate record has required that significant court time and effort be spent to sift through the numerous volumes. Under certain circumstances, dismissal of this appeal would be appropriate. *See Thomas v. Computax Corp.*, 631 F.2d 139, 141–43 (9th Cir. 1980). Furthermore, a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda. *Angel v. Seattle-First National Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981); *Long v. Bureau of Economic Analysis*, 646 F.2d 1310, 1321 (9th Cir. 1981); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

■ None of the affidavits, depositions, or documents raise a genuine issue of fact

regarding the design responsibilities of Weber with respect to the work Weber was directed to perform. The specification control document is a general document relating to all vendors of Boeing. The difficulty with relying upon that document in this case is that the only evidence available indicates Weber was given detailed specifications for a particular component that had to be combined with materials from other vendors and integrated into the lavatory.

Swett made it clear that Weber designed only certain components that would go into a proposed lavatory envelope. Weber's design responsibility was limited to the sink and cabinet and a dispenser. Boeing's specifications required holes in the cabinet at designated locations and of required size. These are the same holes objected to by Rudolph Kapustin, who furnished the evidence as to the cause of this fire.

There is nothing in the record to indicate any responsibility on the part of Weber to either close the holes specified by Boeing or to fill them with non-flammable material. The components supplied by Weber had to be matched with other components supplied by other manufacturers to make the unit. The entire assembly was done at Boeing. Weber had a right to assume that the holes would be closed or that non-flammable material would be placed therein.[6]

There is nothing in the record to indicate that any item or any materials furnished by Weber to be assembled by Boeing within the cabinet were not fire resistant, which was the requirement of the civil air regulations. It is true that Kapustin testified that "the large door, was of a wood compo-

---

**5.** Appellant did not present to us a coherent, well-indexed, well-documented argument. There is still some confusion about what was properly before the district court, and hence, what is properly before us. Anything that was presented to the district court prior to summary judgment could have been considered. *See In re Southland Supply, Inc.*, 657 F.2d 1076, 1080 (9th Cir. 1981). We are uncertain as to what was presented.

**6.** The "carpenter-architect" defense would not apply if the defect were so obvious that Weber knew or should have known that the sink and cabinet unit, as designed, was dangerous. *See Rawlings v. D. M. Oliver, Inc.*, 97 Cal.App.3d 890, 896–97, 159 Cal.Rptr. 119, 121–22 (1979) (a contractor performing in accordance with the plans and specifications of the owner may be liable for a defect in the plans if the defect should have been obvious to a licensed contractor); *Massei v. Lettunich*, 248 Cal.App.2d 68, 72, 56 Cal.Rptr. 232, 234–35 (1967) (a contractor is not liable if he merely carries out the plans and specifications given him, unless the plans are so obviously defective and dangerous that no reasonable person would follow them). As noted in text, however, there was no obvious defect because Weber could reasonably assume that the holes would be filled in by Boeing.

sition material, which although it could have been fire resistant, to a degree, contained fabric, trim which was not." Kapustin Deposition at 1069–72. There is nothing in the record to indicate that the fabric or the trim on the large door was supplied by Weber or that it contributed in any way to the fire or the spread of it.

Kapustin, in his testimony, raised serious doubt about his competence to testify as to the cause of the fire. Varig never rebutted Weber's claim that Kapustin was not qualified to testify about possible defects in the sink and cabinet unit. His testimony, therefore, is entitled to no weight. Even accepting his testimony, however, he only suggests that the lavatory design might have had something to do with the fire. Were we to conclude that this speculative opinion created a factual issue we must still find some evidence that the defendant had some duty of design with respect to the lavatory. The design of the lavatory was done by Boeing and was significantly more expansive than the design of a sink and the cabinet. Even accepting that Weber had some design authority under the general document relating to all Boeing vendors, that design authority was limited to the specific items to be furnished by Weber, i.e., the sink and the cabinet.

Most of the evidence offered by Varig relates to the possibility of hot water heater malfunctions causing the fire. Such cause was ruled out by the French authorities.[7]

Section 21.03 of the specification control document requires the disposal container to be of fire resistant material with incorporated covers. Plaintiff cites no substantial evidence to indicate that Weber was deficient in this regard.

## II. POST–DELIVERY NEGLIGENCE THEORY

■ Varig also argues that manufacturers have a continuing duty to warn operators of design defects which have come to the manufacturer's attention after delivery. *Crane v. Sears Roebuck & Co.*, 218 Cal. App.2d 855, 32 Cal.Rptr. 754 (1963). *See also Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 411 F.2d 451, 453 (2d Cir.), *cert. denied*, 396 U.S. 959, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969). Appellant again fails, however, to cite substantial evidence that would give rise to a triable issue of fact as to whether Weber became aware of any alleged design defect after delivery.

## III. STRICT LIABILITY THEORY

The district court dismissed Varig's strict liability claim against Weber on the authority of *Scandinavian Airline System v. United Aircraft Corp.*, 601 F.2d 425 (9th Cir. 1979) ("*SAS*"). Varig argues that *SAS* is inapplicable to the facts of this case, or alternatively that there are unresolved issues of fact concerning the applicability of *SAS.*

This court held in *SAS* that, as a matter of California law, the doctrine of strict liability does not apply to negotiated transactions between large commercial enterprises. 601 F.2d at 427–29. *See also Tokio Marine & Fire Ins. v. McDonnell Douglas Corp.*, 617

---

7. Varig tries to argue that the French Investigation did not *completely* rule out the possibility of a hot water heater fire because the (translated) report states: "The fire could have been caused *by electrical incident* or by passenger carelessness." (Emphasis added). However, Kapustin, the "expert" upon whom Varig relies, when asked about the meaning of the reference to "electrical incident," responded; "Sir, it was my understanding at the time of the last briefing, that although they did not completely rule out any electrical malfunction, *they pretty much ruled out the possibility of water heaters being involved.*" Kapustin deposition, p. 656, Exhibit E to Weber's *Memorandum of Points and Authorities in Opposition to Varig's Motion to Vacate Order of Reference and to Retransfer the Case to Central District of Cali-*

*fornia* (emphasis added). Don Swett, one of Weber's officers, stated repeatedly that "[w]here Boeing specifications required electrical power, Boeing supplied wiring diagrams." *E.g.,* Swett Affidavit, p. 3, Exhibit B to Weber's *Memo.* In other words, any electrical cause of the fire can be traced to Boeing specifications, *not* Weber design.

In fact, in its opposition to Boeing's motion for summary judgment, Varig argued that it was *Boeing's* design that was at fault. In any event, whether or not Varig's evidence shows that malfunctioning hot water heaters are a *possible* cause of fire is irrelevant to whether a hot water heater was involved in *this* fire.

F.2d 936, 939–40 (2d Cir. 1980); *Delta Airlines, Inc. v. McDonnell Douglas Corp.*, 503 F.2d 239, 245 (5th Cir. 1974), *cert. denied,* 421 U.S. 965, 95 S.Ct. 1953, 44 L.Ed.2d 451 (1975); *Kaiser Steel Corp. v. Westinghouse Electric Corp.*, 55 Cal.App.3d 737, 746–48; 127 Cal.Rptr. 838, 844–45 (1976).

In the companion to this case, *Varig Airlines v. Boeing Co.*, 641 F.2d 746 (9th Cir. 1981), we held that the rule of *SAS* was fully applicable to Varig and Boeing. That holding controls this case as well. The involvement of Weber as a component manufacturer does not materially alter the analysis; all three parties—the airline, the manufacturer of the aircraft, and the manufacturer of the component—were negotiating from positions of relatively equal economic strength, and were able to allocate their risks by contract.

## IV. CONCLUSION

The comments made by the district judge are significant:

> I wouldn't have any trouble finding a duty by law if Kidde or Weber built the lavatory in all of its aspects and turned it over to Boeing as a cohesive, completed unit. The thing that bothers me is that apparently they only did, as the record shows, make some of the components that went into this completed lavatory, and they didn't know whether they were ordered to make these holes in back. I think that they would have a right to assume that those holes are for some purpose to be filled with something. Also, they are not responsible for the air conditioning and the fire alarm system and so on. I am not sure that under those circumstances they owe a duty to anybody but Boeing to carry out the Boeing specifications.

RT, June 18, 1979, pp. 32–33.

██ A mere scintilla of evidence is not sufficient. Juries should be permitted to draw only those inferences from the evidence which are reasonably susceptible without resorting to speculation. *British Airways Board v. Boeing*, 585 F.2d 946, 952 (9th Cir. 1978).

There is no evidence that the fire was caused or spread because of any act or failure of defendant. Neither is there any evidence that defendant had any design authority or responsibility that contributed in any way to this unfortunate disaster.

As stated by Judge Kilkenny in *Kaufman Ins. Corp. v. Johnson*, 623 F.2d 598, 601 (9th Cir. 1980), "[t]his is one of those cases where it would be a complete waste of judicial time to remand for a trial."

The summary judgment is AFFIRMED.[8]

---

8. Appellee shall recover costs. *See* Fed.R. App.P. 39(a).