Boyd **PAULSON**, Plaintiff,

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al.,** Defendants.

No. CV 94–2691 JSL.

United States District Court, C.D. California.

Oct. 27, 1994.

Michael J. Faber, Yuhl, Faber & Yuhl, Santa Monica, CA, for plaintiff.

John N. Frye, Frye & Alberts, Los Angeles, CA, for defendants.

OPINION

LETTS, District Judge.

Plaintiff Boyd Paulson ("Paulson") has sued his automobile insurance carrier, State Farm Mutual Automobile Insurance Company ("State Farm") for breach of contract, bad faith, intentional infliction of emotional distress, negligent infliction of emotional distress, and fraud arising out of State Farm's initial refusal to cover Paulson for injuries he sustained in an automobile accident caused by the negligence of an underinsured motorist. State Farm initially denied coverage to Paulson based on medical records indicating that Paulson had recovered fully from his injuries and on the fact that Paulson had received already $21,740 from the negligent driver's insurer and his employer in workers' compensation. State Farm eventually paid Paulson the $8,260 that he originally had requested, the full value of his insurance policy and its entire contractual obligation.[1]

State Farm moved for summary judgment under Federal Rule of Civil Procedure 56, arguing that Paulson cannot sustain any of the causes of action alleged in his complaint as a matter of law. Based on a review of the file, record and proceedings, and for the reasons stated below, this Court granted defendant State Farm's motion for summary judgment. Judgment was entered on October 17, 1994.

The legal issues in this case are not novel and ordinarily would not merit a written opinion. This case, however, is a prime example of what Ninth Circuit Judge Kozinski has labelled the "tortification of contract law," or the tendency of courts to treat a contract dispute as a tort, which creates incentives for plaintiffs to invest in tort causes of action. *See Oki America, Inc. v. Microtech Int'l, Inc.,* 872 F.2d 312, 315–16 (9th Cir.1989) (Kozinski, J., concurring) (discussing the tort of bad-faith denial of the existence of a contract). All contracts, including insurance contracts, include in their initial calculus the estimated costs of performance. This allows insurance companies, who are in

---

1. Paulson's underinsured motorist policy provided bodily injury coverage of $30,000, which is offset by the amounts he received from his employer and the negligent motorist's insurer. *See* Statement of Facts and Fn. 8, *infra.*

the business of writing contracts to pay claims, to price their policies accurately to include these costs. Tort damages, on the other hand, depend on case-by-case jury determinations that often turn on nebulous standards, resulting in the inability of insurance companies to estimate and account for those costs in advance. Thus, an insurer like State Farm facing potential tort liability for a failure to pay an insured's policy limits on demand is under great pressure to settle the lawsuit rather than to spend large amounts of money and time to litigate the case to an unpredictable result. The ability of an insured to create a tort lawsuit out of a good faith denial of insurance coverage creates settlement value for the plaintiff out of proportion to the merits of the underlying contract dispute.

In a case like this, where the insured has obtained the full measure of contract performance, courts should make a threshold determination of whether the undisputed facts support the existence of a tort cause of action. *Cf. Cox v. Resilient Flooring Div. of Congoleum Corp.*, 638 F.Supp. 726, 731 (C.D.Cal.1986) (facts which do not give rise to contractual liability should not form the basis for liability in tort of breach of implied-in-fact promise to terminate employee only for good cause). A possible standard for this determination would be whether the plaintiff has alleged facts which would, if proved, so shock the conscience of the court that to provide no remedy would frustrate the clear ends of justice. *Cf. id.* at 738 (proposing such a standard). Certainly, an insurer may remain liable in tort if it unreasonably and in bad faith withholds payment of the claims of its insured. *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 486, 510 P.2d 1032, 1038 (1973). Courts, however, must be able to address at the earliest possible stage the initial determination of wheth-

er, as a matter of law and based on the undisputed facts, the insurer's actions are unreasonable and in bad faith.

The following sections will set forth in more detail the undisputed facts and the Court's conclusions of law.

## I. UNDISPUTED FACTS

On March 6, 1992, plaintiff Paulson was involved in an automobile accident caused by the negligence of an underinsured motorist. At the time of the accident, Paulson was driving a van owned by his employer, Pacific Bell, and was operating it in the scope of his employment as a service technician. As a result of the accident, Paulson sustained various bodily injuries, including a broken finger, minor lower back pain, and a cut on his forehead.

Paulson received a total payment of $21,-740 from the insurance company of the driver who caused the accident, Allstate Insurance Company ("Allstate"), and from his employer, Pacific Bell, in workers' compensation benefits.[2]

On or about September 11, 1992, six months after the accident, Paulson submitted an underinsured motorist claim under his policy with State Farm. The policy provided Paulson with bodily injury coverage of $30,-000 in the event he was injured in an automobile accident caused by the negligence of an uninsured or underinsured motorist. Paulson presented a claim for $8,260, the difference between what he received from Allstate and Pacific Bell and the limits of his underinsured motorist policy.

Paulson's claim was assigned to State Farm claim representative Nancy Bennett on September 11, 1992. State Farm claim superintendent Peggy Ellis was assigned to supervise Ms. Bennett's handling of the file.[3]

---

**2.** Paulson received from Allstate $15,000, the limit of the other driver's liability policy, and from Pacific Bell $11,740 in workers' compensation benefits. Paulson reimbursed Pacific Bell $5,000 for certain medical and other expenses incurred on his behalf from the proceeds of his settlement with Allstate. Therefore, a net amount of $21,740 was paid to Paulson in connection with his accident.

**3.** State Farm has submitted ample evidence that Bennett was adequately trained as a State Farm claim representative. The training for each State Farm claim representative consists of the following: (1) a six-week orientation period, during which each representative receives individualized instruction from a State Farm Claim Superintendent; (2) a three-week claims school; (3) presentations given by automotive and medical professionals about various aspects of damage

That day, Bennett reviewed Paulson's claim file, which included looking at and evaluating medical bills, records, and reports that Paulson had submitted to State Farm in support of his claim. The records that Bennett reviewed revealed that Paulson's primary accident-related injury was a fractured little finger on his nondominant (left) hand. Paulson had undergone surgery for this injury, followed by three weeks of rehabilitative therapy.

Paulson's hand surgeon, Dr. Mitchel Silverman, M.D., wrote a series of reports detailing Paulson's post-surgical recovery. These reports indicated that Paulson experienced rapid and consistent progress in the healing of his finger injury. In his final report, dated July 22, 1992, Dr. Silverman wrote that Paulson's finger essentially was healed. Dr. Silverman reported his "opinion that Mr. Boyd Paulson has no permanent disability nor prophylactic work restrictions." Dr. Silverman concluded that "with regard to the injury in question, no further medical treatment or hand therapy is warranted."[4]

Paulson also received rehabilitative physical therapy at the California Hand Center following his surgery. His records from the Center indicate that he received treatment there on nine occasions between April 1, 1992 and April 22, 1992. The California Hand Center records document Paulson's recovery. In Paulson's discharge evaluation report, dated April 22, 1992, therapist Jody Giangreco rated Paulson's pain at "0" while at rest and at "1" while active, on a "pain scale" of one to ten, ranging from least to most pain. She described Paulson's progress as "excellent" and stated that "[a]t this time, I believe that Boyd has received maximum benefits from formal hand therapy." She concluded that "[n]o further hand therapy is indicated."

The only other medical records in Paulson's file relate to a minor low back soft tissue injury for which he sought physical therapy on eleven occasions between March 13, 1992 and April 2, 1992. The records reflect no further treatment for that condition after April 2, 1992.

Based on the documentation in Paulson's file, Bennett formed the opinion that the $21,740 paid by Allstate and Pacific Bell adequately compensated Paulson for the injuries he sustained in the March 6, 1992 accident.[5]

Bennett submitted two progress reports to Ellis concerning Paulson's claim. Upon receipt of the progress reports, Ellis reviewed them to ensure that Bennett's investigation of the claim was proceeding properly. On October 20, 1992, when Ellis received Bennett's second progress report, she reviewed the entire file again.

Based on Paulson's medical records, Bennett's progress reports, and the fact that Paulson's medical bills had been paid, Ellis also concluded that the $21,740 aggregate payout by Allstate and Pacific Bell adequately compensated Paulson for the injuries he sustained in the March 6, 1992 accident.

and injury evaluation; (4) lectures by State Farm employees with medical background and training, typically as registered nurses; and (5) a "trainee" period lasting several months, during which time the trainee is closely supervised by a Claim Superintendent. After the trainee period, claim representatives are given more responsibility and less supervision, although they continue to receive training and supervision throughout their employment.

Bennett participated in this training program and was supervised by Claim Superintendent Peggy Ellis. Bennett finished in the top five of her claim school class of approximately thirty five students. No one seriously contends that Bennett was not trained properly reasonably and adequately to perform her duties.

4. Dr. Silverman cited several medical facts and findings in support of his opinion that Paulson suffered no disability: (1) that Paulson was "working without restrictions" at the time of the report; (2) that there was "no evidence of neurovascular deficits in the left small finger;" (3) that the range of motion of the left small finger was "within normal limits" and that there was "no deficit in left elbow, forearm, finger or wrist motion;" (4) that Paulson's surgical scar was "well healed" and associated tenderness was "slight;" (5) that "[f]lexor function and extension function" were "normal;" and (6) that Paulson's x-ray films revealed "no evidence for angulation or rotational problems." Faber Declaration in Support of Opposition to Defendant's Motion for Summary Judgment, Exhibit 5.

5. In a subsequent arbitration, it was determined that Paulson's medical bills totalled $12,448.52. His lost wages amounted to $1,632. Thus, given his $21,740 payment, Paulson initially received $7,659.48 in additional compensation.

Ellis informed Paulson, by letter to his attorney, dated November 9, 1992, of State Farm's position that no further payment was warranted.[6] Paulson's attorney disputed State Farm's position and, by letter dated November 16, 1992, demanded that Paulson's claims be submitted to arbitration.

State Farm assigned attorney Lisa Rosenwasser to handle the arbitration of Paulson's claim on behalf of State Farm. Ellis mailed Paulson's claim file to Rosenwasser on December 2, 1992. Based on the file materials, including Paulson's medical bills, records, and reports, Rosenwasser concluded that the $21,740 aggregate payout by Allstate and Pacific Bell reflected reasonable value for the personal injury and damage claim submitted by Paulson. Rosenwasser based her conclusion on much of the same facts upon which the State Farm claims adjusters had relied.

On December 10, 1992, Rosenwasser noticed Paulson's deposition for the mutually agreed upon date of February 16, 1992. On December 20, 1992, Paulson's lawyer spoke with Rosenwasser and stated that Paulson's personal injury claim was limited to the period between March 6, 1992, the date of the accident, and July 22, 1992, the date on which Paulson was deemed "permanent and stationary" by Dr. Silverman. Paulson's lawyer stated that Paulson was not seeking compensation for residual injury, that the injuries essentially had healed over the course of the treatment period, and that State Farm's file was current with respect to Paulson's wage loss and other damage claims.

Paulson's deposition twice was continued upon plaintiff's request and finally was conducted on April 6, 1993. At the deposition, Paulson claimed for the first time that he had residual symptoms and lost wages for which he still was not compensated.

On April 9, 1993, three days after Paulson's deposition, State Farm recommended a re-evaluation of its settlement position, and offered Paulson the remaining $8,260 available under the underinsured motorist policy.

Paulson's lawyer immediately rejected the offer that day.

On April 30, 1993, Paulson's lawyer telephoned Rosenwasser and stated that his client's settlement demand was now $35,000. He suggested that the $35,000 payment would protect State Farm from Paulson's lawsuit for bad faith. State Farm rejected the new settlement demand and Paulson elected to proceed with arbitration.

The arbitration of Paulson's claim against State Farm took place on May 21, 1993. The arbitrator found that Paulson's damages exceeded State Farm's $30,000 policy limits,[7] and concluded that State Farm was obligated to pay Paulson the total sum of $8,260. State Farm paid that amount to Paulson.

## II. ANALYSIS

### A. *Standard for Summary Judgment*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56.

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the movant presents evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986);

---

**6.** Paulson already had retained legal counsel before he was informed that his claim to State Farm was denied.

**7.** The arbitrator found that the damage suffered by Paulson totalled $49,580.52 (medical $12,-448.52; wage loss $1,632.00; general $35,-000.00).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *See Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1305–06 (9th Cir.1982). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Celotex Corp. v. Catrett, supra.*

The Ninth Circuit has held that "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *Varig Airlines v. Walter Kidde & Co.,* 690 F.2d 1235 (9th Cir.1982). Paulson has failed to raise properly genuine issues of fact and therefore has failed to defeat State Farm's motion for summary judgment.

### B. *Paulson's Claims*

The material facts of this case are undisputed. Paulson was injured in an automobile accident. He received $21,740 from Allstate and in workers' compensation for his injury. In determining whether to pay the $8,260 requested by Paulson, State Farm claim representatives reviewed medical records and reports that Paulson had submitted. In these reports, Paulson's doctor stated that Paulson's condition was "permanent and stationary," that he had no permanent disability arising from the injury, and that, on a scale of one to ten, Paulson's pain was rated zero

to one. Based on these reports, State Farm denied Paulson's claim.

Paulson demanded arbitration. Paulson's attorney informed State Farm that he was not seeking compensation for residual pain or lost wages. During his deposition prior to arbitration, however, Paulson told State Farm for the first time about his residual pain and entitlement to compensation for lost wages. Based on this new information, State Farm offered to pay the policy limit before arbitration was completed. Paulson rejected the settlement offer and elected to go forward with arbitration. The arbitrator concluded that State Farm was obligated to pay Paulson $8,260, the amount that State Farm offered to pay prior to the arbitration. State Farm paid that amount.

Based on the facts above, Paulson has no viable causes of action as a matter of law.

#### 1. *Breach of Contract Claim*

In his first cause of action, Paulson alleges that State Farm's initial refusal to pay the $8,260 in benefits upon demand by Paulson constituted a breach of the underinsured motorist provisions of his insurance contract. Paulson further claims that he was injured by the breach because he was forced to demand arbitration of his claims.

Paulson's claim is not viable. State Farm has paid Paulson the limits of liability under his policy.[8] To the extent Paulson claims emotional distress as a result of State Farm's alleged delay in paying the policy limits, such a remedy is not to be awarded on a cause of action for breach of contract. *Sawyer v. Bank of America,* 83 Cal.App.3d 135, 139, 145 Cal.Rptr. 623, 625 (1978). *See also* 1 B.E. Witkin, Summary of Cal. Law, Contracts, § 829 at 746 (9th ed. 1987 and Supp. 1993) (noting that damages are not recovera-

---

**8.** While the stated limits of underinsured motorist coverage under Paulson's policy are $30,000, State Farm was entitled to set off from that limit the amounts paid to him from Pacific Bell ($11,-740 in workers' compensation less $5,000 in reimbursement) and Allstate ($15,000), which totalled a net payment of $21,740. Thus, State Farm's policy limits were the difference between $30,000 and $21,740, or $8,260. *See* Cal.Ins. Code § 11580.2(h) ("Any loss payable under the terms of the uninsured [or underinsured] motorist endorsement as coverage to or for any person

may be reduced: (1) By the amount paid ... under any workers' compensation law, exclusive of nonoccupational disability benefits"); § 11580.2(p)(4) ("When bodily injury is caused by one or more motor vehicles, whether insured, underinsured, or uninsured, the maximum liability of the insurer providing the underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage limits, less the amount paid to the insured by or for any person or organization that may be held legally liable for the injury").

ble for mental suffering from breach of contract).

Paulson also cannot claim incidental damages resulting from any alleged breach of contract, namely the costs of arbitration and attorneys fees. To the extent that Paulson alleges that he incurred increased attorney's fees, Paulson retained his attorney even before he was informed that State Farm had decided not to pay any further compensation. Thus, he has failed to establish a causal connection between the breach and the damages sought.

Paulson was offered $8,260 by State Farm more than one month prior to the arbitration hearing. He rejected this offer, choosing instead to go to arbitration despite the fact that, under the policy, Paulson could not be awarded more than that which was offered. Paulson will not be compensated for his decision to incur those expenses.

Because Paulson was not compelled to undergo arbitration, and because he retained counsel before State Farm rejected his claim, there is no causal connection between either of these events and any conduct by State Farm. Thus, there are no damages as a matter of law for breach of contract.

### 2. Bad Faith Claim

In his second cause of action, Paulson alleges that State Farm's conduct amounted to a breach of its covenant of good faith and fair dealing and that he is entitled to compensation for the costs of arbitration, attorneys fees, interest and other damages. He states that as a direct cause of State Farm's initial refusal to pay the policy limits, Paulson suffered mental and emotional distress, including "frustration, depression, nervousness, and anxiety." Complaint, at 5.

■ Under California law, all insurance contracts contain an implied covenant of good faith and fair dealing which requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefit of the agreement. *Hanson v. Prudential Ins. Co. of America*, 783 F.2d 762, 766 (9th Cir.1985). An insurer may breach this covenant if it fails properly to investigate its insured's claim, *Egan v. Mutual of Omaha Ins. Co. et al.*, 24 Cal.3d 809,

819, 169 Cal.Rptr. 691, 695, 620 P.2d 141, 145 (1979), *cert. denied*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), or when it refuses, without proper cause, to compensate its insured for a loss covered by the policy. *Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 920, 148 Cal.Rptr. 389, 394, 582 P.2d 980, 985 (1978). Denial of benefits alone, however, does not demonstrate bad faith. *Hanson*, 783 F.2d at 766. The withholding of benefits must be "unreasonable," *Congleton v. National Union Fire Ins. Co.*, 189 Cal.App.3d 51, 59, 234 Cal.Rptr. 218, 222 (1987), or "without proper cause," *California Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal.App.3d 1, 54–55, 221 Cal.Rptr. 171, 200–01 (1985).

In evaluating the evidence to see if there was any unreasonable conduct by the insurer, "it is essential that no hindsight test be applied. The reasonable or unreasonable action by the [insurer] must be measured as of the time it was confronted with the factual situation to which it was called upon to respond." *Austero v. National Casualty Co.*, 84 Cal.App.3d 1, 32, 148 Cal.Rptr. 653, 673 (1978).

■ In this case, both State Farm's claim representative Bennett and claim superintendent Ellis reviewed Paulson's medical bills, medical records and physical therapy records relating to his March 6, 1992 accident. Based on these reports indicating that Paulson suffered minimal residual pain and no permanent disability, and that his medical expenses were reimbursed, Bennett and Ellis reached the conclusion that the $21,740 already received by Paulson adequately compensated him for his injuries. Given the facts available to State Farm, the initial evaluation and denial of Paulson's claim for the remaining $8,260 available under his policy was not unreasonable or without proper cause.

After Paulson testified in his April 6, 1993 deposition that he continued to suffer from residual pain, that he feared additional surgery, and that he had foregone an estimated $1,000 in overtime pay, State Farm re-evaluated its settlement position and offered Paulson the $8,260. Paulson refused the offer, and subsequently, the arbitrator awarded

him that amount. The fact that State Farm changed its initial position and that the arbitrator subsequently found that State Farm owed Paulson the limit of his policy does not imply that State Farm acted in bad faith in the first instance.

■ As a matter of law, the conduct of State Farm in handling Paulson's claim was reasonable and took into account equally and fairly both the interest of the insurer and the insured. Where the full value of an underinsured motorist policy has been paid and there is no overt evidence of bad faith, an insured does not have a claim against an insurer for breach of the implied duty of good faith and fair dealing and is not entitled to tort damages.[9]

### 3. *Intentional Infliction of Emotional Distress Claim*

In his third cause of action for intentional infliction of emotional distress, Paulson alleges that State Farm "pursued an outrageous course of conduct, intentionally, and/or recklessly proximately causing plaintiff severe emotional distress, shock and other highly unpleasant emotions" in the form of "frustration, depression, nervousness and anxiety." Complaint, at 6.

■ The elements of a prima facie case for intentional infliction of emotional distress include 1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress and 2) the plaintiff's suffering severe or extreme emotional distress. *Cervantez v. J.C. Penny Co.*, 24 Cal.3d 579, 593, 156 Cal.Rptr. 198, 206, 595 P.2d 975, 983 (1979). The defendant's outrageous conduct must be "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.*

■ As a matter of law, State Farm's conduct cannot be deemed "outrageous" within that definition. The good faith denial of insurance benefits does not amount to extreme conduct that exceeds all bounds of civility. *See Ricard v. Pacific Indemnity Co.*, 132 Cal.App.3d 886, 894–95, 183 Cal. Rptr. 502, 507 (1982) (denial of insurance claim, even if negligent or dilatory, is not outrageous conduct); *Beckham v. Safeco Ins. Co. of America*, 691 F.2d 898, 904 (9th Cir. 1982) (refusal by insurance company to settle third-party suit against insured, even if in bad faith, is not outrageous conduct).

■ Further, Paulson cannot show "severe" distress as a matter of law. In order to establish that element, California law requires that plaintiff prove that he suffered objective symptoms of distress. "[H]eadaches, insomnia, anxiety, irritability [are] not 'severe' under California law." *Standard Wire & Cable Co. v. Ameritrust Corp.*, 697 F.Supp. 368, 372 (C.D.Cal.1988). In his response to State Farm's interrogatories, Paulson stated only that he suffered from "frustration, depression, nervousness and anxiety," and that he had not sought any medical care for the emotional distress alleged in his complaint.

Therefore, Paulson does not have a claim for intentional infliction of emotional distress.

### 4. *Negligent Infliction of Emotional Distress Claim*

In his fourth cause of action for negligent infliction of emotional distress, Paulson again alleges that he experienced frustration, depression, nervousness and anxiety as a result of State Farm's conduct.

■ Generally, damages for the negligent infliction of emotional distress are allowed only when the defendant's conduct contains elements of "intentional malfeasance or bad

---

9. Punitive damages are also not available to Paulson. In order to justify an award of exemplary damages, the plaintiff must prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal.Civ.Code § 3294(a). The defendant must act with the intent to vex, injure, or annoy, or with a conscious disregard of the plaintiff's rights. *Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 462, 113 Cal.Rptr. 711, 718, 521 P.2d 1103, 1110 (1974). Even if the defendant violated its duty of good faith and fair dealing, that alone does not necessarily establish that the defendant acted with the requisite intent to justify an award of punitive damages. *Id.* at 462–63, 113 Cal.Rptr. 711, 521 P.2d 1103. In this case, there is no evidence of bad faith, much less the kind of intentional, reprehensible conduct that would justify the imposition of punitive damages.

faith." *Quezada v. Hart,* 67 Cal.App.3d 754, 761, 136 Cal.Rptr. 815, 819 (1977). As discussed above, State Farm did not act unreasonably in denying Paulson's initial claims, and therefore, it lacked the intentional malfeasance or bad faith necessary to sustain this cause of action.

 Also, serious emotional distress is an essential element of a cause of action for negligent infliction of emotional distress. *Kelly v. General Telephone Co.,* 136 Cal. App.3d 278, 286, 186 Cal.Rptr. 184, 187–88 (1982). Aside from the statement that Paulson suffered from frustration, depression, nervousness, and anxiety, Paulson has not provided any evidence tending to prove that his emotional distress was serious or required medical or professional help.

### 5. *Fraud Claim*

In his fifth cause of action for fraud, Paulson alleges that State Farm, in its policy, represented that it would compensate him under the terms of the underinsured motorist benefits in the event of a covered claim, but that State Farm "did not intend to pay such monies" at the time these promises were made. Complaint, at 8.

The burden of establishing fraud belongs to the insured. *Delos v. Farmers Ins. Group,* 93 Cal.App.3d 642, 656, 155 Cal. Rptr. 843, 852 (1977). The insured must show that the insurer did not intend to fulfill its obligations at the time the contract was entered into; mere denial of coverage will not suffice. *Miller v. American Life Ins. Co.,* 54 Cal.App.3d 331, 338 n. 4, 126 Cal. Rptr. 731, 734 n. 4 (1976). Proof indicative of fraud may come by inference from the circumstances surrounding the transaction, the relationship, and interest of the parties. *Id.* at 338, 126 Cal.Rptr. 731.

Paulson sets forth no facts establishing this cause of action. The undisputed evidence shows that State Farm's conduct in processing Paulson's claim cannot support an inference of prior intent not to fulfill its representations. When State Farm received Paulson's claim, it reviewed all the materials submitted by Paulson. When State Farm learned about Paulson's residual symptoms,

it offered to pay the amount that Paulson originally requested. These actions do not evince intent to defraud plaintiff.

### CONCLUSION

For the reasons stated above, the Court grants defendant's motion for summary judgment.