Mark Steven BAIRD, Plaintiff,

v.

Edward S. ALAMEIDA, Jr., C.A. Terhune, and Robert Presley, Defendants.

No. CV 02–06887 PA SGL.

United States District Court, C.D. California.

Nov. 17, 2005.

Prof. Michael J. Brennan, USC Law Center, Los Angeles, CA, for Plaintiff.

Deputy Attorney General Gerald S. Ohn, Los Angeles, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ANDERSON, District Judge.

### Introduction

Plaintiff Mark Steven Baird is an insulin-dependent diabetic in the custody of the California Department of Corrections and Rehabilitation ("CDC"). He is suing former CDC officials under 42 United States Code section 1983, contending that they acted with deliberate indifference to his serious medical needs by implementing, approving, and/or failing to initiate steps to repeal a CDC policy that (1) requires all CDC institutions to provide a diet known as the "Heart Healthy" diet for standard meals and (2) prohibits CDC physicians from prescribing outpatient therapeutic diets.

This Court previously dismissed five of the original eight defendants and granted partial summary adjudication in favor of the remaining defendants on Baird's claim for injunctive relief. Docket Nos. 35, 88. Currently before the Court is the remaining defendants' motion for summary judgment. Docket No. 95. For the reasons stated below, the Court GRANTS defendants' motion and will enter judgment in their favor.

### Factual Background [1]

Baird was diagnosed with juvenile diabetes when he was a child, and has been dependent on insulin ever since. See Deposition of Mark Steven Baird ("Depo.") at 23–24. Diabetes is a disease characterized by an imbalance of sugar in the body due to the inability of the pancreas to produce insulin. See Declaration of Dr. David C. Araya ("Araya Decl.") ¶ 5. It is treated primarily by administering insulin, monitoring food intake, and exercise. Araya Decl. ¶ 5. The proper dosage of insulin is calculated based on the results of blood sugar tests and the amount of exercise the patient is receiving. Araya Decl. ¶ 5. Because exercise lowers blood sugar levels, the more exercise a person receives, the less insulin that person needs to balance his blood sugar level. Araya Decl. ¶ 5.

Before his incarceration, Baird received medical training and education about the importance of monitoring his blood sugar levels, taking insulin injections, proper diet, and exercise in order to properly treat his diabetes. Depo. at 25, 30–34. He was taught which foods to avoid and how to pick certain foods from a meal and avoid or exchange others. Depo. at 32–33. He became very informed about his condi-

1. Except where expressly noted, the following facts are undisputed.

tion and its treatment, joined the American Diabetes Association, and received information from the National Institute of Diabetes, Digestive, and Kidney Diseases. Depo. at 34. As a licensed paramedic, he was trained to treat and counsel diabetic patients in emergency situations. Depo. at 10–11, 14–17. He still makes an effort to keep up to date on the proper treatment for diabetes. Depo. at 34.

In April 1999, at the age of 29, Baird was convicted of a felony and sentenced to eight years in state prison. Depo. at 8, 18, 36. He was first sent to Wasco State Prison ("Wasco"), a reception center, for two months; after that he was transferred to the California Men's Colony ("CMC"). Depo. at 36, 45, 66. In June 2004, he was transferred to Avenal State Prison ("Avenal"). Depo. at 45, 70. He is currently scheduled to be released on December 16, 2005. Depo. at 84.

At Wasco, Baird had his blood sugar tested and received insulin injections twice a day. Depo. at 36–38. He received a sack lunch every day, in addition to his regular meals and at least once supplemented his meals with food purchased from the canteen. Depo. at 40, 42. He generally exercised four days a week for an hour a day. Depo. at 42–43, 64–65.

Baird was hospitalized twice during his stay at Wasco for treatment of his diabetes. Depo. at 43–44, 47. At the hospital he was fed an American Diabetes Association ("ADA") diet. Depo. at 44.

After his transfer to CMC, Baird was assigned a primary care physician, whom he initially saw once a month and later every two to three months or as needed. Depo. at 45, 48. His treatment regimen changed: he began receiving insulin injections four times a day and, after an initial lag in blood monitoring, began having his blood sugar tested three times a day. Depo. at 45–48; Araya Decl. ¶ 9. His doc-

tor also prescribed adjunct treatments, including a medication to prevent kidney failure. Depo. at 48, 59–60. Baird and his doctor often discussed the best way to keep his blood sugar under control. Depo. at 50. As Baird described it: "they had me actively participate in the treatment decisions [and] it was an education every time I would go and see a physician there." Depo. at 50.

Baird's primary care physician at CMC from February 2002 to February 2004 was David C. Araya, M.D. Araya Decl. ¶ 6. Dr. Araya counseled Baird about how to make proper food choices from the standard prison meal—for example, avoiding high sugar items. Araya Decl. ¶ 7. So did Edith Wong, a registered dietician who works as the Food Administrator at CMC. See Declaration of Edith Wong ("Wong Decl.") ¶¶ 2, 6. Wong also gave Baird a hand-out on carbohydrate counting and talked with him about the theory behind it. Depo. at 50–51, 58, 60, 68–69; see Depo. Ex. 4.

At CMC, Baird had various alternatives to the foods provided in the standard prison meal. He was issued an extra diabetic smack every evening so that he could consume an adequate amount of calories and nutrition each day even if he could not eat all of the items on the prison menu. Araya Decl. ¶ 8; Depo. at 52. The snack consisted of two fresh fruits and half of a sandwich. Summerset Decl. ¶ 10. He had access to the prison canteen, where he would occasionally buy foods such as soups, crackers, tuna, roast beef, and chili beans Depo. at 56. Sometimes he ate food prepared by other inmates in place of the prison meal. Depo. at 57. And he was allowed to receive packages of food from his family every 90 days; they would send him a wide variety of items, including canned foods, crackers, and soups. Depo. at 66.

Baird was generally allowed to exercise on a daily basis at CMC. He typically did so for an hour a day, five days a week. Depo. at 62; *see* Araya Decl. ¶ 9.

CMC began serving the "Heart Healthy" diet around 2000 or 2001. Depo. at 53–54.[2] Baird still had to pick and choose the foods he could eat, as he had before. Depo. at 54.[3] Generally, however, he considered the "Heart Healthy" diet a better diet than the one previously offered, because it is lower in fat and diabetics need to avoid foods that are high in fat. Depo. at 54–55.

Baird was hospitalized because of his diabetes three times during his five years at CMC. The first two times happened in rapid succession just a few months after his transfer to CMC, when he developed diabetic ketoacidosis. Depo. at 62–63; Araya Decl. ¶ 10. At that time he was seen by an outside endocrinologist, who adjusted his insulin dosage. Depo. at 45. His third and last hospitalization at CMC for treatment of his diabetes occurred in late September or October of 2000. Depo. at 62–63. During each of these hospitalizations, he was fed an ADA diet that included items such as pork and yogurt that are not a part of the standard prison diet. Depo. at 63.

There is nothing in the record about the conditions of Baird's incarceration at Avenal or whether he has been hospitalized since he was transferred there.[4] He stated in his deposition (taken shortly before the pending motion was filed) that he has developed diabetic myelopathy since he has been in the custody, but it is unclear when this happened or whether the conditions of his incarceration had anything to do with it. Depo. at 83. He also contends he is at risk of long-term complications from being unable to control his diabetes properly. Depo. at 83–84.

**Procedural History**

Baird filed this lawsuit pro se, seeking injunctive relief and damages under 42 United States Code section 1983. He is currently represented by counsel. All but three defendants have been dismissed. The three remaining defendants are: (1) Edward S. Alameida, the former Director of the CDC from September 2001 through January 5, 2004, *see* Declaration of Edward S. Alameida ("Alameida Decl.") ¶ 2; (2) Robert Presley, the former Cabinet Secretary for the California Youth and Adult Correctional Agency (the predecessor to the CDC) from January 1999 to November 2003, *see* Declaration of Robert Presley ("Presley Decl.") ¶ 2; and (3) C.A. Terhune, former Director of the CDC from August 1997 to November 2000, *see* Declaration of C.A. Terhune ("Terhune Decl.") ¶ 2. Earlier, the Court granted partial summary judgment in favor of the defendants on Baird's claim for injunctive relief. Therefore, all that remains is Baird's claim for damages.

---

**2.** Defendants contend the CDC has been providing the "Heart Healthy" diet since 1997. *See* Sommerset Dec. ¶ 4. Because this is a summary judgment proceeding, the Court gives Baird's evidence the benefit of the doubt. The point is immaterial, in any event.

**3.** When Baird first arrived at CMC—before the facility began serving the "Heart Healthy" dict—a physician there told him the diet was not very good for diabetics. Depo. at 51. He advised Baird to swap food items with other inmates (i.e., trade items he could not eat for those he could) and, if possible, to buy foods from the canteen to supplement the meals provided by the state. Depo. 51–52.

**4.** Because Baird filed his complaint while still in the custody of the CMC, his allegations concern events that happened during his time at Wasco and CMC. He has not amended the complaint to add any allegations concerning his stay at Avenal.

At his recent deposition, Baird made it very clear that his sole claim against the three remaining defendants is that they were deliberately indifferent to his serious medical needs by "approv[ing], implement[ing] or continu[ing] the policy or practice that ... prevented CDC physicians from exercising medical judgment in determining the need in writing prescriptions for therapeutic diets." Depo. at 71, 73. That policy is set forth in section 54080.6 of the CDC's Department of Operations Manual ("DOM"), which states, in relevant part:

> The CDC food plan and standardized department-wide menu for a low fat, "Heart Healthy" diet shall be followed by all institutions for all standard meals. *No outpatient therapeutic diets shall be prescribed.*
>
> [¶]
>
> The DFA shall ensure that the CDC food plan meets the dietary needs of most inmates by providing a "Hearth Healthy" low fat, low salt, diet; that a nutritional analysis of the CDC food plan is done whenever menu changes are made; and that standardized departmental recipes are maintained, consistent with the CDC food plan.

*See* Declaration of Andrew Pitoniak, Ex. 2, emphasis added.

Baird admits that he has never met or spoken to any of the defendants. Depo. at 75. He did, however, send each of them a letter describing his medical condition and requesting an outpatient therapeutic diet, and on that basis alone he contends that they were personally aware of his serious medical needs and that their failure to act after receiving his letters constitutes deliberate indifference. Depo. at 74–78, 87 & Exs. 8–10. Each defendant has submitted

a declaration stating that he does not remember receiving a letter from Baird and that normally his incoming mail from inmates was screened by his staff and he did not review such mail directly. *See* Alameida Dec. ¶¶ 6–7; Presley Dec. ¶¶ 6–7; Terhune Dec. ¶¶ 6–7.[5]

The defendants move for summary judgment on various grounds, arguing, inter alia, that defendants cannot be liable because they have no involvement in Baird's medical treatment, they lack supervisory liability, and they are entitled to qualified immunity. The Court finds one of their arguments—that the CDC policy Baird challenges is constitutional—dispositive. It therefore declines to reach the other potential grounds for summary judgment.

**A Preliminary Note About The Evidence**

After Baird obtained counsel in this case in August 2004, the Court set a date for the scheduling conference. The parties filed a Joint Scheduling Conference Report as required by Federal Rule of Civil Procedure 26(f), jointly requesting a discovery cut-off date of May 30, 2005. Docket No. 68. The Court gave them nearly two more months more discovery than they had requested, setting the discovery cut-off at July 25, 2005. Docket No. 70.

On June 23, 2005, having received a stipulation and proposed order from the parties, the Court extended the discovery cut-off date to August 24, 2005. Docket No. 89.

On July 28, 2005, the parties submitted a second stipulation and proposed order to extend the discovery cut-off to September 19, 2005, representing that plaintiff's counsel needed to take a number of depositions at various California penal institutions, in-

---

**5.** Whether the defendants actually received the letters and were therefore aware of Baird's medical condition and concerns is immaterial here because, as explained below, the evidence will not support a claim of deliberate indifference as a matter of law.

cluding the CMC and Avenal. There was no affidavit from counsel, no explanation of what evidence counsel expected the depositions to yield, and no explanation of why these depositions had not been taken earlier (a significant question, given that defense counsel had already been involved in the case for nearly a year). For the reasons stated herein, the Court denies the proposed order.

Defendants filed their summary judgment motion on August 17, 2005. Docket No. 95. In support of their motion, they lodged a copy of Baird's deposition (which they had taken two weeks earlier) and filed declarations (most with exhibits) from each of the three defendants, two nutritionists (one of whom had counseled Baird), one of the physicians who had treated Baird at CMC, and the CDC's custodian of records. *See* Docket Nos. 97–104.

Plaintiff filed his opposition on August 30, 2005. Docket No. 108. He did not object to any of the defendants' evidence, nor did he file any evidence of his own. Instead, he filed a declaration of counsel stating his intention to rely on Baird's deposition (already lodged by the defendants) as support for his opposition. Docket No. 106; *see* Fed.R.Civ.P. 56(e).

■ Federal Rule of Civil Procedure 56(f) allows a party opposing summary judgment to move for a continuance in order to obtain discovery necessary to oppose the motion. Rule 56(f) requires an affidavit "setting forth the particular facts expected from the movant's discovery" and how those facts will raise a triable issue of fact. *Cook v. Allstate Ins. Co.*, 337 F.Supp.2d 1206, 1209 (C.D.Cal.2004). Mere references in other documents to a need for additional discovery do not qualify as motions under Rule 56(f). *Brae Transp., Inc. v. Coopers & Lybrand,* 790 F.2d 1439, 1443 (9th Cir.1986). "Failure to

comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment" and the party opposing summary judgment "cannot complain if it fails to pursue discovery diligently before summary judgment." *Id.; see also Pfingston v. Ronan Eng'g Co.,* 284 F.3d 999, 1005 (9th Cir. 2002) ("The failure to conduct discovery diligently is grounds for denial of a Rule 56(f) motion").

■ At the very least, plaintiff has failed to file a motion under Rule 56(f) or even to present the Court with an affidavit detailing the specific facts he expects to uncover through discovery and how those facts might help him defeat summary judgment. The Court therefore declines to sign the proposed order submitted with the parties' second stipulation to continue pre-trial dates. The Court will consider only the evidence that has already been obtained and submitted in connection with the summary judgment motion.

■ Finally, in his opposition to the summary judgment motion, Baird recites 19 "facts" that he contends he will be able to prove at trial to demonstrate that the "Heart Healthy" diet is inadequate for diabetic inmates. Docket No. 108 at 3–5. He cites no evidentiary support for *any* of these purported facts. A few of them (which are immaterial and undisputed) find support in his deposition; most do not.

■ It is well established that "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa De Viacao Aerea Rio Grandense v. Walter Kidde & Co.,* 690 F.2d 1235, 1238 (9th Cir.1982). Instead, a party opposing summary judgment must present admissible *evidence* demonstrating that there is a genuine issue for trial. *See Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044,

1049 (9th Cir.1995). The Court therefore disregards these 19 purported facts in determining whether summary judgment is proper.

### The Applicable Legal Standards

Under Federal Rule of Civil Procedure 56, the Court may grant a motion for summary judgment when the papers demonstrate that there is no "genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Prison officials' deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's prohibition against cruel and unusual punishment and will support a claim under 42 United States Code section 1983. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). A deliberate indifference claim requires "a demonstration that prison officials deprived the prisoner of the 'minimal civilized measure of life's necessities.'" *Toguchi v. Chung,* 391 F.3d 1051, 1057 (9th Cir.2004); *see also Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1981).

### Discussion

The gravamen of Baird's lawsuit is his contention that the defendants demonstrated deliberate indifference to his serious medical needs by adopting and maintaining a policy—DOM § 54080.6—that requires the CDC to serve inmates the "Heart Healthy" diet and expressly prohibits physicians from prescribing ADA diets on an outpatient basis for insulin-dependent inmates, and by failing to rescind the policy after he sent them each a letter. *See* Depo. at 73–79 (identifying this as the sole basis for Baird's claim against the three defendants). Baird believes he should be able to get the same diet he was served during his hospital stays even when he is not in the hospital, provided a physician prescribes it.

Although he alleged in his complaint that he arrived at Wasco with a physician's order that he be fed an ADA diet, Complaint ¶ 4, Baird did not testify to that in his deposition and presented no evidence on that point. Nor did he present any evidence that any physician offered or tried to prescribe him a therapeutic ADA diet on an outpatient basis after he entered into the custody of the CDC. Allegations in a pleading, of course, cannot be used to defeat summary judgment; the opposing party must present admissible *evidence* to do so. Fed.R.Civ.P. 56(e); *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). Given the lack of any evidence that DOM § 54080.6 ever interfered with a physician's effort to prescribe an outpatient ADA diet for Baird, it is not clear that the issue is even ripe.

Assuming it is, Baird has failed to demonstrate any triable issue of material fact. In his opposition to the summary judgment motion, Baird identifies only *one* triable issue: "whether the 'Heart Healthy' diet, provided to all inmates in the custody of the CDC, meets the minimum requirements of the Eighth Amendment for insulin dependant diebetic [sic] inmate/patients." Docket No. 108 at 2–3; *see also id.* at 21 (stating, in Conclusion, that summary judgment should be denied because: "Whether the 'heart healthy' diet is adequate to meet the requirements of the Eighth Amendment as to diabetic inmates is a genuine issue of material fact in this case which needs to be litigated.").

The defendants presented evidence on this issue through the declarations of Dr. Araya (a medical doctor) and Ms. Wong (a registered dietician), both of whom personally worked with Baird in helping him

manage his diabetes at CMC; each stated that the "Heart Healthy" diet is appropriate for diabetic inmates. Araya Decl. ¶ 4; Wong Decl. ¶ 4. They also presented the declaration of Susan B. Summerset, a registered dietician who has worked in the field for 33 years and is currently the Departmental Food Administrator at the CDC, responsible for preparing the menus for meals served at CDC prisons, including CMC. Summerset Decl ¶¶ 2–3, 6. Ms. Summerset stated that, in her professional opinion, "diabetic inmates who properly count their carbohydrates and consider the nutritional value of the food items on the Heart Healthy diet can obtain proper nourishment from that diet without adverse health effects." Summerset Decl. ¶ 8.

Baird has presented no evidence to illustrate *why* he believes the "Heart Healthy" diet is inappropriate for insulin-dependent diabetics. There is no evidence in the record concerning the contents of a typical "Hearth Healthy" meal, which food items Baird feels he cannot eat, or the overall percentage of food items per meal that he must avoid.

■ All that Baird offers on this issue—the issue he has identified as the one triable issue—is his own opinion that the diet is unhealthy for him and that he should be given an outpatient ADA diet. But in the Ninth Circuit, an inmate's personal disagreement with prison officials about his need for a particular medical treatment cannot give rise to a civil rights claim based on deliberate indifference. *See Franklin v. Oregon,* 662 F.2d 1337, 1344 (9th Cir.1981) (also holding that a prison official's alleged refusal to allow a diabetic inmate a well-balanced breakfast following an insulin injection did not rise to the level of "deliberate indifference").

Even if Baird had been able to find a physician who supported his opinion, his case could not have survived summary judgment. As noted above, Dr. Araya, Baird's primary care physician at CMC, was of the medical opinion that the "Heart Healthy" diet *is* appropriate for diabetic inmates. Araya Decl. ¶ 4. Thus, the most Baird could possibly have shown would have been a simple difference in medical opinion, which cannot support a claim of deliberate indifference to serious medical needs. *See Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir.1989).

Finally, "in order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently *harmful* to evidence deliberate indifference to serious medical needs." *Estelle,* 429 U.S. at 106, 97 S.Ct. 285, emphasis added; *see also Shapley v. Nevada Bd. of State Prison Comm'rs,* 766 F.2d 404, 407 (9th Cir.1985) (prisoner must show he was harmed as a result of prison officials' deliberate indifference).

In an attempt to show that the CDC's failure to authorize therapeutic outpatient diets harmed him, Baird points to the fact that he was hospitalized twice while at Wasco and three times while at CMC (a total of five times over a period of roughly five years). Depo. at 44, 62–63. He has presented no medical evidence, however, that these hospitalizations resulted from his diet. Indeed, the record shows that during the three years between 1996 and 1998—before he was incarcerated, when he was free to eat any food of his choosing—he was hospitalized three times for treatment of diabetic ketoacidosis. Depo. at 84–85. The rate of hospitalization (averaging once per year) therefore remained unchanged when he entered into CDC custody. The last hospitalization he described in his deposition occurred in September or October of 2000. There is no evidence that he has had to be hospitalized due to his diabetes since then.

1142

■ Baird also testified in his deposition that he had developed diabetic myelopathy. Depo. at 83. Again, however, he presented no evidence that this resulted from any inadequacies in the "Health Healthy" diet or the CDC's failure to provide him with a therapeutic outpatient diet. There is simply no evidence that anything in the CDC's dietary policy was the cause of any harm Baird may have suffered.[6]

The Court concludes that there is no triable issue of material fact and defendants are entitled to judgment as a matter of law for the reasons stated.

IT IS SO ORDERED.

6. In fact, in January 2004, Dr. Araya evaluated Baird and ordered laboratory studies to monitor his diabetes. Araya Decl. ¶ 11. In Dr. Araya's words, the "laboratory results at that time could be interpreted to indicate that inmate Baird had relatively good control of his diabetes during the previous 12 months on the ["Heart Healthy"] diet." Araya Decl. ¶ 11.