DAVID O. CARTER, UNITED STATES DISTRICT JUDGE
Before the Court is Plaintiff Allergan USA, Inc.'s ("Plaintiff" or "Allergan") Motion for Partial Summary Judgment and for Summary Judgment ("Allergan Motion") (Dkt. 94) and Defendants Prescriber's Choice, Inc. ("Prescriber's Choice") and Sincerus Florida, LLC's ("Sincerus" and together with Prescriber's Choice, "Defendants") Motion for Partial Summary Judgment ("Defs. Mot.") (Dkt. 88). The Court heard oral arguments on January 10, 2019.
I. Request for Judicial Notice
Allergan requests that the Court take judicial notice of five FDA documents, Exhibits *1095 A through E of the Allergan Request for Judicial Notice ("Allergan RJN") (Dkt. 94-3), including:
• Exhibit A, FDA, Compounding and the FDA: Questions and Answers , which is available on FDA's website;
• Exhibit B, FDA, Bulk Drug Substances Used in Compounding , which is available on FDA's website;
• Exhibit C, FDA, Information Concerning Outsourcing Facility Registration, which is available on FDA's website;
• Exhibit D, FDA, Guidance for Industry: Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act, which is available on FDA's website; and
• Exhibit E, FDA, 2018 Compounding Policy Priorities Plan , which is available on FDA's website.
Allergan RJN Exs. A-E. Defendants request that the Court take judicial notice of one document, Exhibit 1 of the Defendants' Request for Judicial Notice ("Defs. RJN") (Dkt. 90):
• Exhibit 1, the Form 10-Q quarterly report for the quarter ending on September 30, 2018, filed by Allergan plc on October 31, 2018 with the United States Securities and Exchange Commission.
"Judicial notice" is a court's recognition of the existence of a fact without the necessity of formal proof. See Castillo-Villagra v. I.N.S. , 972 F.2d 1017, 1026 (9th Cir. 1992). Under Federal Rule of Evidence 201, a court may take judicial notice of court filings and other matters of public record. Harris v. Cnty. of Orange , 682 F.3d 1126, 1132 (9th Cir. 2012) (noting that a court may take judicial notice of "undisputed matters of public record"); see also Reyn's Pasta Bella, LLC v. Visa USA, Inc. , 442 F.3d 741, 746 n.6 (9th Cir. 2006) (taking judicial notice of pleadings, memoranda, and other court filings). In addition, judicial notice is appropriate for information obtained from government websites, see Paralyzed Veterans of Am. v. McPherson , 2008 WL 4183981, at *5 (N.D. Cal. Sept. 8, 2008), as well as copies of "records and reports of administrative bodies." United States v. Ritchie , 342 F.3d 903, 909 (9th Cir. 2003). The Court does not, however, take judicial notice of reasonably disputed facts contained within the judicially noticed documents. See Lee v. City of L.A. , 250 F.3d 668, 688-89 (9th Cir. 2001).
Therefore, the Court takes judicial notice of the existence of the documents above. However, the Court does not take judicial notice of the facts within these exhibits subject to reasonable dispute. See Lee , 250 F.3d at 690.
II. Background
A. Facts[1]
Allergan is a U.S. subsidiary of Allergan plc, a global pharmaceutical company that markets a portfolio of leading medical brands and products. Defendant RJN, Ex. 1. Prescriber's Choice and Sincerus are both owned by Florida-based Sincerus Pharmaceuticals, Inc.; share resources, staff, leadership, and business efforts; have the same principal place of business; and the same CEO, Spencer Malkin ("Malkin"). Allergan SUF ¶¶ 3, 6-7. Sincerus produces drugs; Prescriber's Choice markets Sincerus's drugs and makes them *1096 available to physicians. Allergan SUF ¶ 8; Declaration of Joseph Akrotirianakis ("Akro. Decl.") (Dkt. 95), Ex. 1 at 2848. Sincerus registered with the Food and Drug Administration ("FDA") as an "outsourcing facility" under Section 503B of the Federal Food, Drug, and Cosmetic Act ("FDCA") in March 2016.[2] Allergan SUF ¶ 4. Sincerus has formulated, compounded, distributed, and sold drugs from 700 different drug formulations. Allergan SUF ¶¶ 1, 9.[3] Prescriber's Choice has marketed the services of Sincerus. Declaration of Spencer Malkin ("Malkin Decl.") (Dkt. 115-1) at ¶ 3. Prescriber's Choice has roughly 3,000 customers in 30 states to whom Sincerus has distributed their drugs. Allergan SUF ¶¶ 10-11; Akro. Decl., Ex. 2 at 96.
"Drug compounding" is often regarded as the process of combining, mixing, or altering ingredients to create a medication tailored to the needs of an individual patient. Allergan RJN, Ex. A. A drug may be compounded for a patient who cannot be treated with an FDA-approved medication, such as a patient who has an allergy to a certain dye and needs a medication to be made without it, or an elderly patient or a child who cannot swallow a tablet or capsule and needs a medicine in a liquid dosage form. Id. Practitioners in hospitals, clinics, and other health care facilities sometimes provide compounded drugs to patients when an FDA-approved drug is not medically appropriate to treat them. Id. Compounding commonly occurs in pharmacies, although it may also occur in other settings. Id.
The drugs Sincerus and Prescriber's Choice have produced, marketed, and distributed were intended to treat acne, eczema, psoriasis, rosacea, melasma, alopecia, dermatitis, and fungus, among other conditions. Allergan SUF ¶ 14. Defendants have produced, marketed, and distributed drugs containing the bulk drug substances[4] Dapsone, Ciclopirox Olamine, Acyclovir, Fluocinolone Acetonide, Ascorbyl Palmitate, Hydrocortisone, Tolnaftate, Tretinoin, Sulfar, Tazarotene, Sodium Sulfacetamide, and Spironolactone. Allergan SUF ¶ 15. Only one drug used by Defendants (Magnesium Sulfate Injection) appears on FDA's drug shortage list. Allergan SUF ¶ 21. The FDA has not found a "clinical need" for outsourcing facilities to use any bulk drug substances. Id. ¶ 22. Before July 2018, these bulk drug substances were not on the FDA "Category 1" list. Id. ¶ 16. This list is described in further detail *1097 in fra. The "Category 1 list" comprises drugs that the FDA is evaluating to determine whether there is a clinical need. See Allergan RJN, Ex. D. If there is a clinical need, the drugs may be used under the Section 503B statutory exemption. See id. As of September 7, 2017, Defendants were compounding, producing, and marketing drugs using bulk drug substances on FDA's Category 3 list, including Tolnaftate, Sulfur, and Sodium Sulfacetamide. Allergan SUF ¶ 17. The FDA's Category 3 list comprises nominated substances that require more information before the FDA determines whether they belong in Category 1. See Allergan RJN, Ex. D. The parties dispute whether Sincerus continues to use any bulk drug substances on FDA's Category 3 list. Defendants' Statement of Genuine Disputes ("Defendant SGD") (Dkt. 117) ¶ 18.[5] Every one of the bulk drug substances utilized by Sincerus for compounding is obtained from an FDA-registered firm and each of the bulk drugs has an FDA-assigned National Drug Code number. Defendant SGD ¶ 110.
Defendants promote their business through a sales force, marketing program, and sales and training materials that Malkin developed with other employees. Defendant SGD ¶ 23. There is a standard format for the Prescriber's Choice sales pitch, although the initial sales presentation has been modified since early 2016 as some of the materials initially used are no longer relevant due to the changing health care landscape. Defendant SGD ¶ 24; Declaration of Lawrence Silverman ("Silverman Decl.") (Dkt. 116), Ex. 4 at 88. Prescriber's Choice's sales consultants are trained on how to present the Prescriber's Choice platform to customers. Defendant SGD ¶ 25. Prescriber's Choice sales consultants distribute sample advertisements to dermatology clinics that are its customers and work with the physicians to change or personalize the advertisements. Defendant SGD ¶ 26; Arko. Decl., Ex. 1 at 27-28. One advertisement disseminated broadly to dermatology clinics that are Defendants' customers inform patients of the "freedom to choose" between a commercially available medication or Sincerus's customized drugs. Allergan SUF ¶ 27; Arko Decl., Ex. 1 at 31-32.
The parties do not dispute that Defendants have promoted their business and drugs by representing to their customers that Defendants comply with the law, that it is legal for Sincerus to compound in large quantities, and that the business meets federal regulatory guidelines. Allergan SUF ¶¶ 28-29, 31; see also Akro. Decl., Ex. 31 at 661 ("Is the model that Prescriber's Choice & Sincerus FL follow compliant? Yes!"). Specifically, Defendants have represented to their customers: "The truth is that Sincerus FL is a 503B facility (one only has to check the FDA's website listing all registered 503B facilities to verify this) and the drugs compounded by a 503B facility do not have to go through the New Drug Application (or Abbreviated New Drug Application) process. The FDA expressly exempts drugs compounded by 503B facilities from being subject to this process." Allergan SUF ¶ 30. Prescriber's *1098 Choice sales consultants have represented that the medications used in the formulations are FDA approved and "All [Defendants'] prescription medications are FDA approved and are produced using only U.S. sourced FDA approved active ingredients." Allergan SUF ¶¶ 43-44.
Defendants have also promoted their business and drugs by representing to their customers-including those who asked for reassurance or had questions about FDA compliance-that "[t]o demonstrate compliance, Prescriber's Choice and Sincerus FL tasked one of the top international law firms, Ropes & Gray, to analyze whether the business model comports with FDA regulations," and "[t]he resulting written memorandum concludes that if your practice follows the model outlined, you are compliant." Allergan SUF ¶¶ 34, 36; Akro. Decl. Ex. 31. Further, Defendants have represented to customers that "[a] general summary of the conclusions reached in the Ropes & Gray memorandum are as follows: ... Compounding by the outsourcing facility for physician customers under the Prescriber's Choice platform meets the requirements of 503B." Allergan SUF ¶ 35.
On at least one occasion, a Presciber's Choice sales consultant stated to a customer that the Sincerus drugs are "prepared in the FDA facility, Sincerus, so you have the supreme reassurance that the quality of the medication is made under CGMP manufacturing standards with federal oversight." Defendant SGD ¶ 33; Akro. Decl., Ex. 26 at 601. Separately, a different Prescriber's Choice sales consultant represented to a customer that the Ropes & Gray memorandum provides "supreme reassurance that speaks about how Prescriber's Choice and their customers are complaint with both federal and state law." Allergan SUF ¶ 37; Akro. Decl., Ex. 62 at 879. A third Prescriber's Choice sales consultant represented to a customer that the "whole platform has been vetted out and everything is perfectly legal" as Sincerus is a "FDA facility and everything we provide is the only way it is legal." Allergan SUF ¶ 38; Akro. Decl., Ex. 47 at 809.[6] On another occasion, the same Prescriber's Choice sales consultant represented to a different customer that Defendants "have had over 400 independent healthcare attorneys from many states review our whole platform and they all recommend our platform." Allergan SUF ¶ 39; Akro. Decl., Ex. 46 at 805-06. One internal e-mail between Prescriber's Choice employees notes that "I of course did explain to [the customer] that everything comes from our 503B facility and is FDA approved." Akro. Decl., Ex. 51 at 834.
Defendants have also promoted the effectiveness of their drugs, including that "[t]he unique combination of active and inactive ingredients has been selected to produce an outcome that is clinically superior and materially different to that which is commercially available." Allergan SUF ¶ 49.
The FDA does not "accredit" or "approve" Section 503B outsourcing facilities or pharmaceutical ingredients, although the FDA does register and inspect such facilities. Defendant SGD ¶¶ 51, 54, 56. Sincerus has been formally inspected by the FDA three times and submits all active pharmaceutical ingredients used to the FDA as part of statutory semiannual reports, and the FDA has never objected to or disputed the reported information. Defendant SGD ¶¶ 115, 117. It is "slightly *1099 inaccurate" to describe a Section 503B outsourcing facility as "FDA accredited" as the FDA registers and inspects as but does not accredit or approve. Silverman Decl., Ex. 3 at 66. It is disputed whether the statement "Defendants' drugs are FDA-approved" is false, as the bulk drug substances used by Sincerus are all obtained from firms registered by the FDA and are active pharmaceutical ingredients of Section 505 approved drugs. Defendant SGD ¶ 58. It is also disputed whether there is "no reason to believe that Sincerus's drugs are superior to commercially available drugs." Defendant SGD ¶ 64.
Prescriber's Choice sales representatives have represented to customers that Defendants comply with the law because they knew that compliance with the law was an important issue to customers when they make a decision. Akro. Decl., Ex. 2 at 106-05. One of the reasons Defendants convey that the active pharmaceutical ingredients are FDA approved is because dermatologists are seeking safe medication. Akro. Decl., Ex. 6 at 66. Barret Malkin, Prescriber's Choice's National Director, told the sales team that Sincerus's status as a "503B FDA Facility" would provide "even more assurance to patients due to the fact that they are generally familiar with the FDA." Allergan SUF ¶ 72.
Allergan's sales representatives have testified that dermatologists have switched from prescribing branded medications (such as Allergan's) to Prescriber's Choice's drugs. Allergan SUF ¶ 77. It is disputed whether Prescriber's Choice and Sincerus are competitors of Allergan and have been competitors of Allergan at all times material to this action. Defendant SGD ¶ 75.
Allergan commissioned a survey of 202 dermatologists regarding their views on Allergan's medical dermatology products and the products of others, including Prescriber's Choice. Defendant SGD ¶ 137. Allergan's final report on its survey about Prescriber's Choice reflects that 25 percent of physicians "worry about the legality and tediousness of in-office physician dispensing"; 27 percent of the respondents agreed with the statement "I worry about the legality of in-office dispensing"; 18% of the respondents said that "state regulation/restriction concerns" was a challenge with recommending or prescribing Prescriber's Choice's products; and 24 percent of dermatologists who had been visited by a Prescriber's Choice sales representative indicated that they had received "Guidance with governmental regulations" from Prescriber's Choice. Defendant SGD ¶¶ 140-43.
Recently, Allergan entered into a business acquisition agreement ("Acquisition Agreement") whereby Allergan Sales, LLC and APIL sold assets related to Aczone, Azelex, Cordran Tape, Tazorac, and Sarecycline. Defendant Statement of Uncontroverted Facts ("Defendant DUF") (Dkt. 89) ¶ 2. Allergan USA, Inc. (the Plaintiff in this action) has a Supply Agreement with Almirall, Inc.'s ("Amirall") affiliate, Aqua Pharmaceuticals LLC ("Aqua"), through which Allergan has contracted to distribute Aczone and Tazorac in exchange for volume-based payments. Allergan Statement of Genuine Disputes ("Allergan SGD") (Dkt. 111-1) ¶ 2. On September 20, 2018, Allergan Sales, LLC ("Allergan Sales") entered into an Asset Purchase Agreement to sell the dermatology product Rhofade to Aclaris Therapeutics, Inc. ("Aclaris"). Defendant DUF ¶ 3. The agreement includes a provision that gives Allergan Sales an ongoing economic interest in Aclaris's sales of Rhofade and other products containing oxymetazoline as an active pharmaceutical ingredient in the form of earnout payments. Allergan SGD ¶ 7.
*1100 B. Procedural History
Allergan filed this action on September 7, 2017. See Complaint (Dkt. 1). Allergan brings four claims: (1) unfair competition and false advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a) ; (2) unlawful and/or unfair business practices in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, § 17200, et seq. by unlawfully marketing, selling, and distributing their products in violation of the California Sherman Law; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17200, et. seq. ; and (4) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. Ann. § 501.201, et seq. Compl. ¶¶ 95-130. Defendants answered on December 1, 2017 (Dkt. 33).
On October 12, 2017, Defendants filed a counterclaim against Allergan ("Countercl.") (Dkt. 20). Defendants bring two counterclaims: (1) violation of the Lanham Act by using "false or misleading descriptions of fact" and "false or misleading representations of fact" in their commercial advertising or promotion that "misrepresents the nature, characteristics, [or] qualities" of Prescriber's Choice and Sincerus's business practices and their products; and (2) violation of the UCL by unlawfully and falsely advertising and promoting in violation of the Lanham Act. Countercl. ¶¶ 37-48. Allergan answered on November 2, 2017 (Dkt. 27).
On November 14, 2018, Allergan filed the present motion for partial summary judgment. On November 26, Defendants opposed ("Defs. Opp'n") (Dkt. 115). On December 3, 2018, Allergan replied ("Allergan Reply") (Dkt. 128). Allergan moves for summary judgment of liability on each of the four claims asserted in the Complaint, leaving trial for the remedies sought. Allergan Mot. at 1. Allergan also moves for summary judgment on Defendants' counterclaims. Id. at 3.
On November 14, 2018, Defendants filed the present motion for partial summary judgment. On November 26, 2018, Allergan opposed ("Allergan Opp'n") (Dkt. 111). On December 3, 2018, Defendants replied ("Defs. Reply") (Dkt. 125). Defendants move this Court for partial summary judgment as to the prospective declaratory and injunctive relief sought by Allergan. Defendant Mot. at 2-4. According to Defendant, because Allergan sold its rights to manufacture and market the competing products at issue in this lawsuit, it now lacks standing to seek prospective or injunctive relief. Id. at 4.
III. Legal Standard
Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the facts and draw inferences in the manner most favorable to the non-moving party. United States v. Diebold, Inc. , 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) ; Chevron Corp. v. Pennzoil Co. , 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; Celotex Corp. v. Catrett , 477 U.S. 317, 323-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
When the non-moving party bears the burden of proving the claim or defense at trial, the moving party can meet its burden for summary judgment by pointing out that the non-moving party has failed to present any genuine issue of material fact.
*1101 Musick v. Burke , 913 F.2d 1390, 1394 (9th Cir. 1990). A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. There must be specific, admissible evidence identifying the basis for the dispute. S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc. , 690 F.2d 1235, 1238 (9th Cir. 1982).
IV. Discussion
This case is about alleged improper drug manufacturing, false advertising, unfair competition, and deceptive and unfair trade practices. Through the FDCA and its exemptions, Congress allows outsourcing facilities to produce certain bulk drugs when the FDA determines there is a drug shortage or a clinical need. See generally Allergan RJN, Ex. D. As the FDA evaluates which drugs respond to clinical needs, the executive agency has released an interim policy setting forth certain procedures and guidance. See generally id. Defendant Sincerus is an outsourcing facility and thus must comply with the applicable requirements. According to Allergan, it does not. While the FDA has not chosen to enforce against Sincerus or its sales team, Allergan filed this lawsuit to recover from the supposed unlawful conduct, seeking lost profits and restitution for unjust enrichment. Also at issue are Defendants' counterclaims against Allergan: allegations that Allergan is liable for a campaign against Sincerus and Prescriber's Choice to persuade customers that the Defendants engage in illegal business practices and that their compounded drugs violate the law. Defs. Mot. at 24-25.
A. Whether Allergan[7] Has Standing to Seek Injunction or Declaratory Relief
As a preliminary issue, Defendants move for partial summary judgment as to the prospective declaratory relief and injunctive relief sought by Allergan in each of the four counts of the Complaint. Defs. Mot. at 1. The basis for the motion is that on August 3, 2018, Allergan plc sold to third party Almirall all rights and interests to manufacture or market Aczone, the product upon which Allergan based its standing in this lawsuit. Id.
First, Defendants argue that Allergan lacks Article III standing to seek an injunction or declaratory relief because Allergan sold off its rights to all of its medical dermatology products. Id. Defendants argue that Allergan has not met its burden of showing irreparable injury, "a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again." Id. at 5 (citing City of Los Angeles v. Lyons , 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ). According to Defendants, because Allergan no longer distributes competing drugs, it faces no real or immediate threat of injury. Id. at 6. Defendants note that under the Acquisition Agreement between Allergan plc and Almirall, the entity that "could" receive a contingent payment in 2022 is Allergan Sales, which is not a plaintiff or party in the instant case; did not participate in discovery; and did not move to intervene. Defs. Mot. at 6-7. Moreover, Defendants argue that the future contingent royalty available to Allergan Sales is not the basis of standing alleged in the Complaint, and that it is too late to reformulate the lawsuit. Id. In the Complaint, Allergan bases standing "solely on its status as a distributor of competing products such as Aczone." Id. at 7.
Defendants note that that Allergan plc's GAAP accounting has attributed no value *1102 for the 2022 potential future contingency to Allergan Sales. Id. at 8 (citing Defs. RJN, Ex. 1 at 20 ("As part of the sale, the Company received cash consideration of $ 550.0 million and is eligible to receive a contingent payment of up to an additional $ 100.0 million in the event that net sales of the divested products in a specified calendar year exceed a sales target, to which no fair value has been ascribed.") ). Defendants argue that if the contingent earnout is not certain enough to have a value for GAAP, it should not be certain enough for Article III standing. Id. at 8.
Allergan opposes summary judgment as to all prospective relief and argues that it retains an interest in future sales of Aczone and Tazorac because it is party to the Supply Agreement, pursuant to which affiliated Allergan entities manufacture Aczone and Tazorac and Allergan then distributes the drugs. Allergan Opp'n at 1. Allergan argues that after the sale to Almirall, the "only change" is that Allergan distributes the Aczone and Tazorac manufactured by its parent, Allergan Sales, exclusively to Aqua. Id. Under the Supply Agreement, Allergan receives volume-based payments in consideration of the manufacture and distribution of Aczone and Tazorac to Acqua. Id. According to Allergan, "[t]he more Aczone and Tazorac that [Allergan] distributes to Acqua, the more money [Allergan] receives." Id. In addition to the Supply Agreement, Allergan argues that its parent, Allergan Sales, will earn payments tied to future sales of Aczone, Tazorac, and Rhofade under its agreements with Almirall and Aclaris. Id. at 2. According to Allergan, it and its parent company still maintain a continuing economic interest in the sales of the drugs at issue and face future injury. Id.
Much of the relevant facts related to the standing question are not in dispute. The Court briefly recounts the three key agreements at issue:
Almirall Acquisition Agreement: On August 3, 2018, Allergan Sales, (Allergan's parent company) and Allergan Pharmaceuticals International Limited sold to Almirall certain assets relating to Aczone and Tazorac (FDA-approved acne drugs) and other drugs. Defendant DUF ¶ 2; Declaration of Marc Forth ("Forth Decl.") (Dkt. 111-2) ¶ 5. This agreement includes a contingent payment, whereby in the event Almirall's future sales of the products exceed a certain milestone, Almirall shall pay to Allergan Sales in 2022 an amount contingent upon those future sales, but capped at $ 100 million. Forth Decl. ¶ 5.
Supply Agreement: [8] Ancillary to the Almirall Acquisition Agreement is the Supply Agreement between Allergan (the Plaintiff) and Almirall's subsidiary (Aqua) through which Plaintiff has contracted to manufacture Aczone and Tazorac and to distribute those drugs to Aqua. Id. ¶ 7; Forth Decl., Ex. A. Allergan continues to function as the distributor of Aczone and Tazorac, but has delegated its manufacturing duties to Allergan Sales to manufacture the drugs. Id.
*1103 Aclaris Acquisition Agreement: And on October 15, 2018, Allergan Sales, LLC sold to Aclaris certain assets related to the drug Rhofade, a topical rosacea drug. Id. ¶ 3. This agreement includes a tiered earnout structure whereby Aclaris shall pay to Allergan Sales royalties on future sales of Rhofade. Id. Allergan Sales shall receive earnout payments on all sales starting October 15, 2018, and the earnout percentage increases upon certain sales reaching certain thresholds. Id.
The question presented is thus whether under the terms of these agreements, Allergan still has standing despite its parent company's decision to sell assets related to Aczone, Tazorac, and Rhofade, and where Allergan continues to (1) distribute Aczone and Tazorac under an exclusive Supply Agreement and (2) indirectly benefit from earnouts tied to the sales of these drugs. The Court agrees with Allergan that the agreements are conclusive evidence that Allergan continues to have standing to pursue declaratory and injunctive relief. First, because Allergan Sales continues to manufacture Aczone and Tazorac and Allergan continues to supply these drugs to Almirall's subsidiary, Aqua, there is no doubt that Defendants' alleged unlawful conduct would reduce sales of Aczone and Tazorac and thus reduce the volume of those drugs that Allergan distributes. Defendants accuse Allergan of attempting to "retool" the Complaint at the last moment. See, e.g. , Defs. Mot. at 7. But in the Complaint, Allergan admits that "[a]ffiliated Allergan entities manufacture Aczone, and Allergan then distributes Aczone to a network of authorized healthcare professional resellers." Compl. ¶ 23. Thus an exclusive Supply Agreement whereby Allergan affiliates manufacture Aczone and Allergan then distributes the drug to Acqua should not come as a surprise to Defendants-the arrangement has narrowed to an exclusive distribution scheme, and future economic harm is therefore more exact, but this does not impact Allergan's standing to seek injunctive or declaratory relief.
It is a closer call with respect to Rhofade, as the prospective relief is more attenuated. But the earnouts within the acquisition agreements with Aclaris and Almirall are sufficient to establish Allergan's standing, regardless of whether the earnouts are fed directly to Allergan Sales (Allergan's parent company). The parties need not amend the complaint to add Allergan Sales to address this standing argument. Under the agreements, Allergan continues to compete in the market as a distributor under the Supply Agreement and as an indirect recipient of earnouts. If there is a substantial risk that future injury will occur, it will harm Allergan. Allergan therefore has standing to pursue injunctive and declaratory relief.
The Court therefore DENIES Defendants' Motion for partial summary judgment and DENIES AS MOOT Allergan's Motion to Amend Complaint.
B. Defendants' Liability
Allergan moves for partial summary judgment on Defendants' liability under the UCL (and the Sherman Law), the Lanham Act, FAL, and FDUTPA. Allergan Mot. at 13. The Court addresses each claim in turn, beginning with an overview of the statutory and regulatory background governing outsourcing facilities.
1. Statutory and Regulatory Background
Generally, the FDCA and parallel state statutes require approval by the FDA and other state agencies before drugs can be sold. See, e.g. , 21 U.S.C. § 355 ; Cal. Health & Safety Code § 111550(a), (b). Compounded drugs are exempted from these requirements, inter alia , under both federal and state laws when certain conditions are met. See 21 U.S.C. §§ 353a, 353b ;
*1104 16 Cal. Code Regs. § 1735, et seq. In 2013, Congress passed the Drug Quality and Security Act ("DQSA"), amending FDCA Section 503A and adding Section 503B. See DQSA, 113 Pub. L. No. 54, 127 Stat. 587 (2013).
Section 503B of the FDCA, codified at 21 U.S.C. § 353b, regulates compounding by "outsourcing facilities." Outsourcing facilities that seek to compound drugs under this provision must comply with certain registration and reporting requirements. 21 U.S.C. §§ 353b(a)(1), 353b(b). Section 503B does not require a patient prescription for compounding, but instead specifically limits the types of drugs that can be compounded at outsourcing facilities registered under Section 503B. Such 503B facilities can only compound bulk drug substances that appear on (1) a list established by the FDA "identifying bulk drug substances for which there is a clinical need"; or (2) a drug shortage list established by the FDA. 21 U.S.C. § 353b(a)(2)(A).
In addition to the limitation on the types of drugs that may be compounded, Section 503B also imposes a litany of other conditions including, inter alia : (1) the drug is not "essentially a copy of one or more approved drugs"; (2) the drug is not sold wholesale; and (3) the "drug is compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance [with Section 503B]." 21 U.S.C. § 353b(a).
2. Sherman Law/UCL
Allergan argues that Defendants violate the California Sherman Law by selling drugs that have not been approved by the California Department of Health Services or the FDA. Allergan Mot. at 13-14. According to Allergan, such sales are therefore actionable under the UCL as an unlawful business practice. Id.
The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Under the "unlawful" prong, the UCL incorporates other state laws, and violations of those laws are independently actionable. Chabner v. United Omaha Life Ins. Co. , 225 F.3d 1042, 1048 (9th Cir. 2000). This includes California's Sherman Law. Farm Raised Salmon Cases , 42 Cal. 4th 1077, 1091 n.13, 72 Cal.Rptr.3d 112, 175 P.3d 1170 (2008) (holding that Sherman Law violations may form the basis of a UCL claim). California's Sherman Law provides that "[n]o person shall sell, deliver, or give away any new drug" that has not been approved by the California Department of Health Services or FDA. Cal. Health & Safety Code § 111550(a) - (b).
a. Parties' Arguments
Allergan argues that Defendants' practice of "mass manufacturing and marketing unapproved new drugs" violates the Sherman Law. Allergan Mot. at 13-14. First, Allergan argues that Section 503B does not permit Defendants' practice of manufacturing and selling unapproved new drugs because the drugs used by Defendants do not appear on the FDA's drug shortage list or clinical need list. Allergan Mot. at 14. According to Allergan, because the FDA has not found a clinical need for 503B facilities to use any bulk drug substance, Defendants may use bulk drug substances only to produce drugs on the FDA's drug shortage list. Id. Allergan argues that because Defendants admit that they use bulk drug substances to produce their drugs, but only one of these drugs is on the FDA's drug shortage list, Defendants have not complied with Section 503B as a matter of law. Id.
Second, Allergan argues that Defendants cannot rely on the FDA's "Category 1" list, which comprises drugs nominated for inclusion on the clinical need list. Id. According to Allergan, this list does not *1105 displace the statutory requirement that outsourcing facilities may not use bulk drug substances to produce their drugs unless the drug is on the FDA's drug shortage list or clinical need list. Id. Relatedly, Allergan argues that the FDA's enforcement discretion and decision not to enforce certain 503B requirements does not make Defendants' conduct lawful. Id. And Allergan argues that even if the Category 1 list did provide legal cover, it does not protect Defendants because they produced and sold drugs made from bulk drug substances that did not appear on that list at least until July 2018, and according to Allergan, Defendants continue to produce drugs made from substances that are not on the list. Id. at 16 n.16.
Defendants respond by arguing that the FDA is encouraging 503B compounders such as Sincerus to use substances on the FDA's Category 1 list until the FDA finishes its clinical need list. Defs. Opp'n at 5. Defendants note that the FDA issued the Interim Policy in January 2017 that informs stakeholders about how the FDA intends to exercise its enforcement discretion for compounding with those substances on the Category 1 list while the agency compiles and evaluates its clinical needs list. Id. Defendants argue that through the rulemaking process, the FDA asked industry participants to nominate bulk substances for consideration under Section 503B and then created three categories to determine which bulk drugs it would allow for compounding while it worked on the multi-year process of preparing the clinical need list. Id.
As discussed infra , Category 1 comprises substances that may be included in the 503B clinical need list; Category 2 comprises substances not approved for use; and Category 3 comprises nominated substances that require more information. Id. ; see also Allergan RJN, Ex. D. Defendants acknowledge that using bulk drug substances in Category 1 does not give them "free reign" to "do anything they want," and that the FDA may still take enforcement action against an outsourcing facility compounding with a Category 1 substance "if necessary." Id. at 6. But Defendants argue that the FDA has repeatedly inspected Sincerus, made observations of items that need improvement, and has never found any product to be inadequate or altered Sincerus's status as a registered 503B outsourcing facility. Id. Defendants argue that because Sincerus holds a California Outsourcing Facility license and the FDA eventually placed all the relevant the bulk drugs utilized by Sincerus in Category 1, there can be no violation of California law. Id. at 7-8.
b. FDA Interim Policy
As this Court noted in a November 14, 2017 order denying a motion to dismiss in Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc. , No. 8:17-cv-01551-DOC-JDE, that the FDA as an executive agency has chosen not to exercise its discretion to enforce the law does not make Sincerus's actions legal. But the Court should not ignore the FDA's Interim Policy on compounding bulk drug substances under Section 503B and the guidance it provides for outsourcing facilities like Sincerus.[9] If the *1106 FDA is allowing outsourcing facilities to manufacture and distribute drugs during an interim period while the agency determines what clinical needs exist, the Court is hesitant to hold Defendants liable for complying with the FDA's guidance.
Allergan argued extensively during oral argument that the FDA is not encouraging such activity. But under the FDA's Interim Policy suggests otherwise. Defendants cite and rely on the Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the FFDCA (the "Interim Policy"). Defs. Opp'n at 5; Allergan RJN, Ex. D.[10] That document uses the header "Contains Nonbinding Recommendations" at the top of each page and provides in the introduction that "[i]n general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited." Allergan RJN, Ex. D. The document describes the conditions that must be met for a drug product compounded by an outsourcing facility to qualify for 503B exemptions, including that the outsourcing facility does not compound drug products using a bulk drug substance unless (a) there is a clinical need , or (b) the drug compounded from such bulk drug substances appears on the drug shortage list . Allergan RJN, Ex. D at 2 (citing Section 503B(a)(2)(A) of the FDCA) (emphasis added). The document notes that Section 503B requires that the FDA create a list of bulk drug substances for which there is a clinical need and that the FDA published a notice inviting all interested persons to nominate bulk drug substances for inclusion on that list. Id. at 3.
The Interim Policy provides that nomination of a drug does not mean the drug will be placed on the clinical need list. Id. The document describes the three categories of drugs nominated to be on the clinical need list. Id. The drugs in Category 1 are substances that "may be eligible for inclusion on the 503 bulks list[.]" Id. (emphasis added). The document sets forth an interim policy while the agency makes a determination regarding particular bulk substances. Id. at 7. Per the Interim Policy, the FDA does not "intend to take action against an outsourcing facility for compounding a drug using a bulk drug substance that does not appear on the 503B bulks list ... provided that the following conditions are met: (1) The bulk drug substance appears on 503B Category 1 on FDA's website [.]" Id. at 8.
The Court will not hold Sincerus liable as a matter of law for "sell[ing], deliver[ing], or giv[ing] away any new drug" that has not been approved by the California Department of Health Services or FDA if they have complied with the Interim Policy. Cal. Health & Safety Code § 111550(a) - (b). While the Interim Policy does not override statutory obligations, the Court supports the FDA's authority and flexibility as it determines what clinical needs exist. The Court does not wish to set a policy that limits the ability of the FDA to determine whether there is a clinical need for particular drugs while simultaneously allowing the compounding of certain drugs to meet health needs. The FDA has set forth a process whereby it receives *1107 information to evaluate whether the nominated substances should appear on the Category 1 list. If Sincerus has acted in good faith in complying with these FDA guidelines and processes, the facility has not run afoul of the Sherman Law.
c. Whether Sincerus Complied With FDA Interim Policy
But that does not end the inquiry. The Court must next determine whether Sincerus has in fact complied with the FDA interim policy, or whether the company has "sold, delivered, or given away any new drug" in violation of the FDCA and the FDA's guidance. In other words, if Sincerus compounded drugs that are not on the Category 1 list, Defendants cannot seek protection under either the 503B exemptions or the FDA Interim Policy.
Defendants admit they have produced, marketed, and distributed drugs containing the bulk drug substances Dapsone, Ciclopirox Olamine, Acyclovir, Fluocinolone Acetonide, Ascorbyl Palmitate, Hydrocortisone, Tolnaftate, Tretinoin, Sulfar, Tazarotene, Sodium Sulfacetamide, and Spironolactone. Allergan SUF ¶ 15. And it is undisputed that before July 2018, these bulk drug substances were not on the FDA Category 1 list. Id. ¶ 16. Defendants also admit that their drugs containing these bulk substances do not appear on FDA's drug shortage list. Id. ¶¶ 21-22. And as of September 7, 2017, Defendants were compounding, producing, and marketing drugs using bulk drug substances on FDA's Category 3 list, including Tolnaftate, Sulfur, and Sodium Sulfacetamide. Allergan SUF ¶ 17. Thus even with the FDA Interim Policy taken into account, the undisputed facts show that Sincerus began compounding and distributing drugs before they appeared on the FDA's Category 1 list. Defendants do not dispute these facts, and do not adequately address why their use of these drugs before they appeared on the Category 1 list did not violate the law. Defendant SGD ¶ 16 ("Undisputed"); Akro. Decl., Ex. 1 at 47 ("Q: The FDA's inclusion of the bulk drug substances ... in the Category 1 list did not occur until July of 2018, correct? A: That is correct. Q: So at least up until July 2018 you ... were manufacturing drugs containing bulk drug substances [not on the Category 1 list]? A: That is correct."); Defendant SGD ¶ 17 (Disputed in part, as to the roles of Sincerus versus Prescriber's Choice).
Whether Defendants still produce and sell drugs made from bulk drug substances that are not on the Category 1 list is less clear. Defendants dispute whether they manufacture drugs using bulk drug substances on the Category 3 list. Defendant SGD ¶ 18. Malkin testified that he does not believe Sincerus continues to manufacture certain drugs contained on the Category 3 list. Akro. Decl., Ex. 1 at 50. ("Q: Do you know if Sincerus continues today to manufacture drugs using bulk drug substances contained on the Category 3 list? A: No, I don't believe so."). As Allergan emphasized during oral arguments, Malkin also testified that Prescriber's Choice "uses" Coenzyme Q10; but it is not clear to the Court whether Sincerus continues to use this drug, especially in light of the prior testimony. See Akro. Decl., Ex. 1 at 58. There is at least a genuine dispute of fact as to whether Sincerus continues to use these drugs in violation of Section 503B and the Interim Policy, and this is a dispute of fact proper for the jury to resolve.
The undisputed facts viewed in the light most favorable to the non-movant prove that Defendants violated the Sherman Law and the UCL's unlawful prong by making and selling unapproved drugs without complying with Section 503B or the FDA's Interim Policy up until July 2018. There is a genuine dispute of fact as to whether Defendants continue to violate *1108 the law, or are abiding by the FDA's Interim Policy by using only drugs on the Category 1 list.
3. Lanham Act/FAL
Allergan next moves for partial summary judgment on its claim for false advertisement under the Lanham Act, the California FAL, and the fraudulent prong of the UCL. Allergan Mot. at 17. Claims under the FAL are substantially congruent to those under the Lanham Act. Cleary v. News Corp. , 30 F.3d 1255, 1263 (9th Cir. 1994) (citing Meta-Film Assocs., Inc. v. MCA, Inc. , 586 F.Supp. 1346, 1362 (C.D. Cal. 1984) (concluding that misappropriation deemed "unfair" under the Lanham Act is also "wrongful" and proscribed under § 17200 ) ).
To state a claim for false advertising under the Lanham Act, a plaintiff must allege that: (1) the defendant made a false statement of fact in a commercial advertisement; (2) the statement actually deceives or has the tendency to deceive its audience; (3) the deception is material; (4) the defendant entered its false statement into interstate commerce; and (5) the plaintiff has or is likely to be injured as a result. Southland Sod Farms v. Stover Seed Co. , 108 F.3d 1134, 1139 (9th Cir. 1997) ; see also Newcal Indus., Inc. v. Ikon Office Solution , 513 F.3d 1038, 1052 (9th Cir. 2008).
a. Parties' Arguments
Allergan argues that there is no genuine dispute of fact as to whether Defendants violated the Lanham Act by engaging in false advertising. Allergan Mot. at 17. First, Allergan argues that Defendants make literally false statements about the lawfulness of their business, including that the FDA and hundreds of lawyers approve of their conduct. Id. at 18. Specifically, Allergan argues the following buckets of statements are literally false:
• Statements about legal compliance because Defendants do not comply with Section 503B's requirements. Id ;
• Statements about FDA "approval" because the FDA does not approve any of Sincerus's drugs nor approve or accredit businesses or drug ingredients. Id . ;
• Statements that Sincerus is an FDA lab because Sincerus is a registered 503B outsourcing facility, accomplished by "sending certain information to the FDA through an electronic registration system." Id. at 18-19; and
• Statements that "hundreds of lawyers" including the law firm Ropes & Gray LLP have opined that Defendants' business is lawful because Defendants were not able to name any lawyers who made this conclusion and the Ropes & Gray memorandum assumed compliance. Id. at 19.
Second, Allergan argues that Defendants also falsely contend that their products are superior to Allergan's products by stating that their products "improve patient outcome" and that the "unique combination of active and inactive ingredients has been selected to produce an outcome that is clinically superior and materially different to that which is commercially available."Id. at 20. According to Allergan, Defendants admit that there is no basis for such statements. Id.
As to the other Lanham Act factors, Allergan first argues that these literally false statements are made in the context of commercial advertisements or promotions. Id. at 21. According to Allergan, the statements were made by Defendants' sales representatives to multiple physicians for the purpose of influencing them to buy Defendants' drugs instead of their competitors' drugs, and were part of a standardized *1109 sales pitch developed to convince physicians to partner with Defendants. Id. at 21. Next, Allergan argues these statements can be presumed to be deceptive as "Defendants admitted that many of their statements were false," but that even without the presumption the statements were deceptive and material. Id. And according to Allergan, it has suffered competitive injury as a result of the statements, the extent of which will be proven at trial through expert data analytics. Id. at 22.
Defendants argue that none of the allegedly false or misleading statements raised by Allergan involve material facts that could or did deceive any recipient. Defs. Opp'n at 11. According to Defendants, their customers comprise a sophisticated group of licensed and board-certified dermatologists, not one of whom would believe that Defendants are operated by the FDA. Id. Defendants argue that Allergan has focused on "offhand statements" by field representatives "in individual correspondence" and implies that such statements have the same Lanham Act import as a national advertisement. Id. Defendants respond to each bucket of statements as follows:
• "FDA approval": Defendants argue that such statements are not literally false as every active ingredient utilized by Sincerus is an API utilized in a FDA-approved 505 drug acquired from a FDA-registered source and each formula is submitted to the FDA for biannual review. Id. According to Defendants, each bulk drug at issue was reviewed by the FDA for placement onto the Category 1 list. Id. And Defendants argue there is "not a single instance" where a dermatologist or patient did not understand that Sincerus produces compounded drugs made from FDA-approved APIs in a 503B registered outsourcing facility. Id.
• "FDA lab": Defendants argue that Sincerus is an FDA 503B registered outsourcing facility inspected by the FDA and that there is no instance identified by Allergan where any person thought that Sincerus was somehow operated by the FDA. Id.
• "Lawyer review": Defendants argue that the Sincerus model has been reviewed by "countless medical practices (and their lawyers)" but that they did not "take a roll call" of their customers' lawyers. Id. at 12. With regards to the Ropes & Gray memorandum, Defendants argue that the lawyers correctly assumed that the use of bulk drug substances is consistent with current FDA policy. Id.
• "Superior product": Defendants argue that Sincerus's drugs clearly can improve patient outcome and that such terms cannot be considered statements of material fact for which falsity could be assessed. Id.
Defendants also contend that Allergan has not shown that any statements actually misled, confused, or deceived customers. Id. at 13. Defendants point to an Allergan survey conducted in 2017 that Defendants argue shows "most" dermatologists "do not care" about the issues raised by Allergan. Id. at 14.
b. False Statements in Commercial Promotion
The Court begins the analysis by addressing whether there is a material dispute of fact as to whether Defendants made false statements of fact in the context of commercial advertisements or promotions.
To demonstrate falsity within the meaning of the Lanham Act, a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally *1110 true but likely to mislead or confuse consumers. Southland Sod Farms , 108 F.3d at 1139. When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context. Id. Mere puffery is not actionable. See Newcal Indus. v. Ikon Office Solution , 513 F.3d 1038, 1053 (9th Cir. 2008). A statement that is quantifiable may be an actionable statement of fact, but a general, subjective claim is not actionable. Id. (citing Cook, Perkiss, & Liehe v. N. Cal. Collection Serv., Inc. , 911 F.2d 242 (9th Cir. 1990) ). "Puffing is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely." Southland , 108 F.3d at 1145.
To constitute commercial advertising or promotion, a statement of fact must be: (1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. Coastal Abstract Service, Inc. v. First American Title Insurance Co. , 173 F.3d 725, 735 (9th Cir. 1999).
The parties do not dispute that Defendants have promoted their business and drugs by representing to their customers that Defendants comply with the law, that it is legal for Sincerus to compound in large quantities, and that the business meets federal regulatory guidelines asdf. Allergan SUF ¶¶ 28-29, 31; see also Akro. Decl., Ex. 31 at 661 ("Is the model that Prescriber's Choice & Sincerus FL follow compliant? Yes!"). Some of these statements are not literally false. For example, Defendants have represented to their customers: "The truth is that Sincerus FL is a 503B facility (one only has to check the FDA's website listing all registered 503B facilities to verify this) and the drugs compounded by a 503B facility do not have to go through the New Drug Application (or Abbreviated New Drug Application) process. The FDA expressly exempts drugs compounded by 503B facilities from being subject to this process." Allergan SUF ¶ 30. Defendants have also stated in a promotion: "Is it legal for Sincerus FL to compound in large quantities? Yes!" Allergan SUF 29. These statements are not literally false. As Allergan acknowledges, Congress permits outsourcing facilities to produce drugs on a larger scale under certain circumstances to meet patient needs. Allergan Mot. at 5. Sincerus did not make a literally false statement by describing itself as a 503B facility and noting that Congress has carved out such an exception for compounders.
But there is a difference between (1) describing to customers the FDCA's 503B exception and (2) representing to customers compliance with that exception or general FDA approval. While Sincerus may currently produce drugs in compliance with the FDA Interim Policy, there is no dispute of fact that the company used drugs that were not on the FDA Interim Policy's Category 1 list. See supra , Section IV(B)(2). And even compliance with the FDA Interim Policy cannot be equated with "FDA approval." The FDA instituted and is following a process by which it determines whether there is a clinical need for outsourcing facilities to produce drugs using certain bulk drug substances. It is literally false for a company to represent that a compounder is "FDA approved" during this period of regulatory evaluation, especially when the compounder is not even complying with FDA's interim guidance.
*1111 It is true that the FDA inspects outsourcing facilities like Sincerus according to a risk-based schedule. Allergan RJN, Ex. A. Facilities that register with FDA as outsourcing facilities under section 503B are primarily overseen by FDA and inspected by FDA accordingly. Id. But falling within the sphere of FDA enforcement does not equate to FDA "approval." The FDA Interim Policy makes this clear. The introduction of the guideline provides that "[i]n general, FDA's guidance documents do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited." Allergan RJN, Ex. D.
Despite not producing drugs that are on the drug shortage or clinical need lists, Prescriber's Choice sales consultants have represented that the medications "are FDA approved." Allergan SUF ¶¶ 43-44. Defendants have also promoted their business and drugs by representing to their customers-including those who asked for reassurance or had questions about FDA compliance-that "[t]o demonstrate compliance, Prescriber's Choice and Sincerus FL tasked one of the top international law firms, Ropes & Gray, to analyze whether the business model comports with FDA regulations," and "[t]he resulting written memorandum concludes that if your practice follows the model outlined, you are compliant." Allergan SUF ¶¶ 34, 36; Akro. Decl. Ex. 31. Further, Defendants have represented to customers that "[a] general summary of the conclusions reached in the Ropes & Gray memorandum are as follows: ... Compounding by the outsourcing facility for physician customers under the Prescriber's Choice platform meets the requirements of 503B." Allergan SUF ¶ 35.
On at least one occasion, a Presciber's Choice sales consultant stated to a customer that the Sincerus drugs are "prepared in the FDA facility, Sincerus, so you have the supreme reassurance that the quality of the medication is made under CGMP manufacturing standards with federal oversight." Defendant SGD ¶ 33; Akro. Decl., Ex. 26 at 601. Separately, a different Prescriber's Choice sales consultant represented to a customer that the Ropes & Gray memorandum provides "supreme reassurance that speaks about how Prescriber's Choice and their customers are complaint with both federal and state law." Allergan SUF ¶ 37; Akro. Decl., Ex. 62 at 879. A third Prescriber's Choice sales consultant represented to a customer that the "whole platform has been vetted out and everything is perfectly legal" as Sincerus is a "FDA facility and everything we provide is the only way it is legal." Allergan SUF ¶ 38; Akro. Decl., Ex. 47 at 809.[11] On another occasion, the same Prescriber's Choice sales consultant represented to a different customer that Defendants "have had over 400 independent healthcare attorneys from many states review our whole platform and they all recommend our platform." Allergan SUF ¶ 39; Akro. Decl., Ex. 46 at 805-06. One internal e-mail between Prescriber's Choice employees notes that "I of course did explain to [the customer] that everything comes from our 503B facility and is FDA approved." Akro. Decl., Ex. 51 at 834.
Again, a 503B model may be "perfectly legal." Congress enacted two specific exceptions that permit 503B facilities to use bulk drug substances: to produce a drug *1112 that appears on the FDA's drug shortage list or where the FDA has found a clinical need for outsourcing facilities to produce drugs using a given bulk drug substance. 21 U.S.C. § 353b(a)(2)(A). But this does not mean that the drugs produced under the 503B exception are "FDA approved" and it does not mean that the outsourcing facility is in compliance with the other conditions of Section 503B or FDA interim guidance.
At least before July 2018, Sincerus was not compliant. The company used drugs that were not on the FDA drug shortage list, the clinical need list, or the Category 1 list. Only Magnesium Sulfate Injection appears on the FDA's drug shortage list. Allergan SUF ¶ 21. None of the drugs produced by Defendants is on the clinical need list; indeed, the FDA has yet to identify any bulk drug substance for which there is a clinical need for use by outsourcing facilities. Id. ¶ 22. And compounded drugs are not FDA-approved. Allergan RJN, Ex. A. This means that FDA does not verify the safety or effectiveness of compounded drugs. Id. It is more than "slightly inaccurate" (as Defendants contend) to describe a Section 503B outsourcing facility as "FDA accredited" as the FDA registers and inspects but does not accredit or approve. Silverman Decl., Ex. 3 at 66. And that the bulk drug substances used by Sincerus are all obtained from firms registered by the FDA and are active pharmaceutical ingredients of Section 505 approved drugs does not alter the analysis. Defendant SGD ¶ 58. The fact that Defendants' products contain drugs approved in other drugs does not mean Defendants' products are FDA approved. If that were the case, there would be no need for the FDA interim process determining whether such drugs should fall under the 503B exemption as a clinical necessity. There is therefore no material dispute of fact that Sincerus representatives made literally false statements to customers by suggesting that they were legally compliant with the 503B requirements and were "FDA approved."[12]
This conclusion does not apply to statements regarding drug superiority. Defendants have also promoted the effectiveness of their drugs, such as that "[t]he unique combination of active and inactive ingredients has been selected to produce an outcome that is clinically superior and materially different to that which is commercially available." Allergan SUF ¶ 49. There is no doubt that such drugs can improve patient outcome and provide drugs that may otherwise be unavailable, for example if a patient has a specific allergy to a type of medication. See Allergan RJN, Ex. A. Outsourcing facilities can give doctors more flexibility to decide what to prescribe. See id. Allergan's arguments that such statements are literally false because there is "no reason to believe that the ingredients ... are of any greater purity" is unavailing. Allergan Mot. at 6. There is least a dispute of fact as to whether the statements regarding superiority of the drugs are literally false where the drugs may allow a patient relief where she cannot tolerate a more traditional prescription.
c. Material Deception
An advertisement that is not literally false may support a Lanham Act *1113 claim only if it is shown "that the advertisement has misled, confused, or deceived the consuming public." Southland Sod , 108 F.3d at 1140. Deliberately false comparative claims give rise to a rebuttable presumption of actual deception. Id. at 1146. Because the statements regarding FDA approval and legal compliance are literally false, there is a rebuttable presumption of actual deception. Regardless, the undisputed facts make clear that the legality of Sincerus's operation was material to Prescriber's Choice's customers. Prescriber's Choice sales representatives have represented to customers that Defendants comply with the law because they knew that compliance with the law was an important issue to customers when they make a decision. Akro. Decl., Ex. 2 at 106-05. One of the reasons Defendants convey that the active pharmaceutical ingredients are FDA approved is because dermatologists are seeking safe medication. Akro. Decl., Ex. 6 at 66. Malkin, Prescriber's Choice's National Director, told the sales team that Sincerus's status as a "503B FDA Facility" would provide "even more assurance to patients due to the fact that they are generally familiar with the FDA." Allergan SUF ¶ 72.
Indeed, some of the false commercial promotions were made in direct follow-up to customer questions about quality and FDA compliance. One doctor sent an email stating that he had concerns about the quality of Prescriber's Choice product, specifically that he had heard about a patient who used the ciclopirox compound that "ate through her skin on the toes." Akro. Decl., Ex. 23 at 586. In follow-up correspondence, the Prescriber's Choice sales consultant stated, "The quality of the medication is made under the most strict regulatory standards. We not only have to meet the federal regulatory standards but also state standards. We meet and exceed all of these from every angle and this is something we do not take lightly." Id. at 584. This correspondence was sent in February 2017, when Sincerus admits it used drugs that were not on the FDA Category 1 list. Id. Separately, a director of operations for a cosmetic dermatology clinic sent a sales representative an email asking about the legality of a numbing cream. Akro. Decl., Ex. 66 at 904. The sales consultant responded that "[a]ll our practices meet and exceed BOTH STATE and FEDERAL guidelines. Our process is 100% compliant[.]" Id. at 903 (capitalization in original).
Defendants largely rely on a survey conducted by Allergan before they filed this action to argue that statements regarding legality are not material to experienced customers familiar with FDA and its policies. Defs. Opp'n at 14. But the Court views this survey as confirmation that customers did in fact consider the legality of Sincerus's operations. According to the survey, about 24% of dermatologists visited by Prescriber's Choice sales representatives indicated that they received guidance with governmental regulations. Defs. DUF ¶ 144. And 27% responded that they agreed with the statement, "I worry about the legality of in-office dispensing." Id. ¶ 141. This data does not rebut the presumption that the literally false statements were material to Prescriber's Choice customers.
4. FDUTPA
The FDUTPA bans "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "Under FDUTPA, a deceptive practice is one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."
*1114 Washington v. LaSalle Bank Nat. Ass'n , 817 F.Supp.2d 1345, 1350 (S.D. Fla. 2011). "The Florida Supreme Court has noted that 'deception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.' " Zlotnick v. Premier Sales Grp., Inc. , 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc. , 842 So.2d 773, 777 (Fla. 2003) ). A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice in the course of trade or commerce; (2) causation; and (3) actual damages. See Dolphin, LLC v. WCI Communities, Inc. , 715 F.3d 1243, 1250 (11th Cir. 2013) (citations omitted); Diversified Mgmt. Solutions, Inc. v. Control Systems Research, Inc. , No. 15-81062-CIV, 2016 WL 4256916 at *5 (S.D. Fla. May 16, 2016).
Defendants argue that Allergan cannot establish "actual damages." Defs. Mot. at 15. According to Defendants, the FDUTPA does not include consequential damages such as lost profits, and therefore Allergan's alleged lost sales are not recoverable under the Florida statute. Id. at 16. Allergan argues that Defendant's understanding of the FDUTPA is based on a superseded version of the statute that limited recovery to consumers. Allergan Reply at 23. According to Allergan, the Florida legislature amended the statute to permit any injured person to sue for damages and that this replacement of the word "consumer" with "person" demonstrates an intent to allow a broader base of complainants, including competitors, to seek damages. Id. at 24. The weight of Florida law supports Allergan's position with respect to past lost profits. See, e.g., Glob. Tech LED, LLC v. Hilumz Int'l Corp. , 2017 WL 588669, at *9 (M.D. Fla. Feb. 14, 2017) (collecting cases and holding that past lost profits are a "proper form of 'actual damages' " under FDUTPA).
Defendants make no other arguments regarding liability under the FDUTPA. The Court notes that its analysis regarding the Lanham Act and FAL applies here. Defendants made misleading statements to customers regarding FDA approval and compliance with Section 503B.
C. Allergan's Liability
Lastly, Allergan moves for summary judgment on Defendants' Counterclaims for violations of the UCL and Lanham Act. Allergan Mot. at 24. Defendants argue that there is evidence that Allergan had an official policy to spread doubt about Prescriber's Choice and Sincerus, and that Allergan coordinated with its competitors to jointly spread that doubt. Defs. Opp'n at 16. Allergan argues that because Prescriber's Choice did violate 503B and was at least using drugs not on the Category 1 list before July 2018, as discussed supra , it follows that the alleged statements cannot be false and thus cannot be the basis for liability under the UCL and Lanham Act.
The Court agrees that spreading doubt about the legality of a company that is not complying with the FDA Interim Policy cannot give rise to a valid claim under the Lanham Act. But there is enough evidence presented to the Court to suggest that Allergan sales representatives went beyond the mere spreading of doubt. True, Defendants point to two sales presentations that use the language "plant the seed of doubt" among dermatologists about Prescriber's Choice and compounding. Defs. SGD ¶ 133. But according to Defendants, documents show that Allergan worked alongside competitors Galderma and Valeant to "shut Prescriber's Choice out of St. Louis." Defs. Opp'n at 17; Defs. SGD 136. One exhibit includes a letter from a dermatologist referencing defamatory remarks made to providers about Prescriber's Choice prescription medications. Silverman Decl., Ex. 18 at 214.
*1115 Another dermatologist references an Allergan sales referenced violations of the Stark Law. Id. , Ex. 19. It is a close call, but in viewing the facts in the light most favorable to the non-movant Defendants, a reasonable jury could determine that Allergan violated the UCL and Lanham Act. Defendants have pointed to enough evidence of a defamatory campaign that stretches beyond the mere spreading of doubt about a company who is not complying with the FDA Interim Policy. Again, the burden is flipped for these counterclaims because Allergan is moving for summary judgment, not Defendants. The Court leaves it to the jury to make this determination at this stage.
V. Disposition
For the reasons explained above, the Court DENIES Defendants' motion for partial summary judgment as Allergan has standing to assert claims for declaratory and injunctive relief. For the same reasons, the Court DENIES AS MOOT Allergan's motion to amend the Complaint.
The Court GRANTS IN PART Allergan's motion for partial summary judgment as to liability under the Sherman Law/UCL claims before July 2018, when Sincerus was not compliant with the FDA Interim Policy. The Court GRANTS IN PART Allergan's motion for partial summary judgment as to liability under the Lanham Act, FAL, and FDUTPA.
The Court DENIES IN PART Allergan's motion for partial summary judgment as to the claims asserted against Allergan as there is at least a material dispute of fact as to whether personnel embarked on a campaign to shut down Defendants. The Court preserves this issue for trial.

Unless indicated otherwise, to the extent any of these facts are disputed, the Court concludes they are not material to the disposition of the Motion. Further, to the extent the Court relies on evidence to which the parties have objected, the Court has considered and overruled those objections. As to any remaining objections, the Court finds it unnecessary to rule on them because the Court does not rely on the disputed evidence.

Outsourcing facilities are a category of compounders established in 2013 by the Drug Quality and Security Act. Allergan RJN, Ex. A. Outsourcing facilities are inspected by FDA according to a risk-based schedule and are subject to increased quality standards. Id. Facilities that register with FDA as outsourcing facilities under section 503B are primarily overseen by FDA and inspected by FDA according to a risk-based schedule. Id.

Defendants dispute that they manufacture drugs, arguing that Sincerus compounds drugs and in some states is considered a manufacturer only for licensing purposes. Defendant SGD ¶ 9. But Defendants state in their Counterclaim, defined infra , that "Sincerus formulates, manufactures, sells, and distributes compounded drugs." Countercl. ¶ 19. And Spencer Malkin (CEO and corporate designee of both Defendants) testified that Sincerus "manufactures" drugs. Declaration of Joseph Akrotirianakis, Ex. 1 at 2848. The Court views these statements as admissions that Defendants "manufacture" drugs.

Compounders sometimes produce drugs using bulk drug substances, also known as active pharmaceutical ingredients ("API"). Allergan RJN, Ex. B. For example, when a patient has an allergy to an ingredient in an FDA-approved drug, an outsourcing facility might compound a drug product using a bulk drug substance that does not contain the allergen. Id. Because compounding from bulk drug substances presents risks to patients, sections 503A and 503B of the FDCA place limits on the bulk drug substances that can be used in compounding. Id.

The Court notes that Allergan's purported support for the statement that Defendants "manufacture drugs using bulk substances that are on FDA's Category 3 list" does not clearly support the position that Sincerus currently uses any bulk drug substance on the list. See Akro. Decl., Ex. 1 at 58-59 ("Q: Have you ever [used Desonide]? A: I believe at one point we did, yes. Q: Do you know when you stopped? A: I don't."). Subsequent testimony regarding Nystatin and Kojic acid does not clearly elicit when Sincerus used the drugs to compound. The Court denies Allergan's request to "make a specific factual finding that the [Malkin] affidavit is a sham [because] it directly contradicts the declarant's previous testimony with no explanation." Allergan Reply at 3.

That the sales consultant followed up with a recommendation that the physician set up a conference with the legal team does not create a dispute as to whether the sales consultant made such representations. Indeed, the email from Julia Edwards leaves no doubt that such representations regarding the "perfectly legal" platform were made.

As defined supra , "Allergan" shall be used to refer to Allergan USA, the Plaintiff in this action.

Defendants move to exclude the Supply Agreement, arguing that Marc Forth did not disclose its existence during deposition testimony and that the document was not produced until November 11, 2018, after the October 22, 2018 discovery cut-off. Defs. Reply at 7-9. The Court denies this objection. Defendants have not requested additional depositions in light of the production of the Supply Agreement, but may make such a request before trial. Regardless, Marc Forth testified that Allergan will continue to provide manufacturing services. Id. at 7. Evidence that Allergan continues to distribute Aczone and Tazorac should not be excluded on the basis of a failure to disclose. Indeed, this evidence is consistent with the Complaint, where Allergan states that an affiliate manufactures. Compl. ¶ 23; Defs. Reply at 8.

In Imprimis , the Court noted that the defendant was alleged to have compounded its product at the 503B facility using bulk drug substances not listed as a Category 1 drug on the interim bulk-drug list. November 14, 2017 Order at 12. The Court also addressed this issue in the context of a false advertising claim under the Lanham Act, not the Sherman Law. Id. Here, the Court looks to the facts to determine whether Defendants complied with the FDA guidance before determining whether they are liable under the Sherman Law for distributing drugs that have not been approved by the FDA or California agencies.

The Court notes that Defendants rely on the content of this document in support of its argument, and Allergan has requested judicial notice of the document in its entirety. Neither party objects to the content of the document. See Defs. Opp'n at 5 ("[The document] outlines how FDA intends to exercise its enforcement discretion for compounding with those substances while the agency compiles its clinical needs list. Until the FDA finishes its clinical need list, it is encouraging 503B compounders such as Sincerus to use the substances on its Category 1 list.").

That the sales consultant followed up with a recommendation that the physician set up a conference with the legal team does not create a dispute as to whether the sales consultant made such representations. Indeed, the email from the sales consultant leaves no doubt that such reorientations were made.

There is no doubt these statements have been made in the commercial context. For example, Prescriber's Choice's sales consultants are trained on how to present the Prescriber's Choice platform to customers. Defendant SGD ¶ 25. Prescriber's Choice sales consultants distribute sample advertisements to dermatology clinics that are its customers and work with the physicians to change or personalize the advertisements. Defendant SGD ¶ 26; Arko. Decl., Ex. 1 at 27-28.